## JOSEPH SMITH v. BOARD OF COUNTY COMMISSIONERS OF RENVILLE COUNTY.[1]

### January 28, 1896.

### Nos. 9851—(354).

**County-Seat Election—Number of Votes Cast—How Determined.**

> For the purpose of determining the number of "votes cast" at an election held under the county seat removal act of 1889[2] (G. S. 1894, §§ 647–656), all of the ballots cast, unintelligible as well as intelligible, must be considered; and, to effect a removal, it must affirmatively appear that at least 55 per cent. of all votes or ballots cast were in favor thereof.

**Same.**

> At the election in question, 2,219 votes were cast in favor of removal, 1,780 votes against removal, and 68 votes or ballots were deposited in the ballot boxes, presumably by legal voters, from which it was impossible to ascertain whether the voters intended to vote for or against removal. *Held*, that the requisite 55 per cent. of the "votes cast" was not obtained.

Proceeding in the district court for Renville county by Joseph Smith to contest the validity of an election held July 18, 1894, for changing the county seat of said county. The matter was tried be-

---

1 Reported in 65 N. W. 956.        2 Laws 1889, c. 174.

fore Webber, J., who found that the county seat was changed by the election.    From a judgment entered in pursuance of such findings, the contestant appealed.    Reversed.

*Thos. E. Boylan*, *John Lind* and *G. T. Christianson*, for appellant.

*S. R. Miller*, County Attorney, *Geo. W. Somerville*, *Lyndon A. Smith* and *A. J. Volstead*, for respondent.

COLLINS, J.    This was a county-seat contest, in which findings of fact and conclusions of law were made and filed in the court below.    Pursuant thereto, judgment was entered changing and removing the county seat of Renville county from the village of Beaver Falls, at which place it had theretofore been, to the village of Olivia, and this appeal is from such judgment.

Three questions have been presented and discussed by counsel for the contestant and contestee, and of these three we find it necessary to consider but one, and that is: Did the proposition for a removal of the county seat receive the required number of votes, the requisite number being fixed at 55 per cent. of the "votes cast" at the election, which is a special one in all cases (G. S. 1894, § 649), the percentage before mentioned being fixed by section 650?

According to the findings, 2,219 votes were cast in favor of the removal, while 1,780 votes were cast in opposition, and there were deposited in the ballot boxes, presumably by legal voters, 68 ballots from which it was impossible to ascertain whether the depositors intended to vote for or against removal; that is, 68 legal voters had endeavored to give expression to their views at this special election, but had failed to do so in a manner intelligible to the trial court.    And, in passing, it may be remarked that, while the court below found but 68 of these unintelligible ballots, the town boards and the board of county commissioners, when canvassing the votes, had much more difficulty, for not less than 20 ballots rejected by these boards as unintelligible and defective were held by the trial court to sufficiently indicate the voter's choice.

It is urged in behalf of the contestant that, in determining whether 55 per cent. of the votes cast at the election were in favor of

a change of county seat, these 68 ballots, rejected by the court as unintelligible, must be taken into consideration as a part of the total vote cast; and, if this be so, it stands admitted that the requisite percentage of votes was not obtained, and the removal proposition did not carry.

This controversy is to be disposed of by construing a statute containing some peculiar provisions upon an important subject, which provisions indicate a positive intention on the part of the legislature to give some degree of permanence to county seats already or to be located, by removal or otherwise, and a clear design to prevent frequent changes, or any change at the behest of a mere majority. That this was the manifest intent and design of the lawmakers is apparent from several prominent features of the county-seat removal act of 1889.

The petition for a change must be signed by legal voters of the county in a number equal to 60 per cent. of the whole number voting at the preceding general election, as shown by the election returns; and in the recent case of Slingerland v. Norton, 59 Minn. 351, 61 N. W. 322, it was held that the whole number voting at such election must be ascertained from the poll lists, not from the official count, for that would only disclose the number of votes cast for a particular office. Yet the poll lists might and probably would, under our system, include names of voters who had cast wholly unintelligible ballots, and therefore rejected for every purpose. To this petition there must be appended an affidavit made by at least two of the signers, containing, among other things, a statement that the names of the signers were attached within the 60 days next preceding its date. It was also held in the Slingerland Case that the word "majority," in the second clause of section 647, did not accurately express what was meant by the legislature, and that, used as it was, it must be construed as meaning not a mere majority, but the majority required by the preceding clause, —60 per cent. in number of those who, according to the poll lists, had cast their ballots at the preceding general election. The statute then provides for the filing of the verified petition with the county auditor. If due notice of an intention to circulate the petition has been given (last proviso of section 647), which must be shown by affidavit, and every other statutory requisite or condition

has been complied with, it is the duty of the auditor to make the order for a meeting of the board of county commissioners, to notify the members of the board thereof, and to give public notice of the time and place of the meeting at which the commissioners will consider and act upon the petition, that all legal voters may have an opportunity to be present if they choose.

From the provisions of section 648, it is obvious that the legislature took great pains to prevent the cost and turmoil of a contest at the polls over the removal of a county seat unless 60 per cent. of the legal voters had fully, fairly, and advisedly demanded an election. If the board of county commissioners find that the prescribed percentage of voters have demanded such an election, and have adhered to the demand, they so certify, with considerable formality, to the county auditor, and he is then obliged to give notice of the election. It is provided in a general way that the special election shall be conducted, and the votes cast shall be canvassed, certified, returned, and recorded, as at other elections.

By section 649 the form of the ballot is prescribed. The county commissioners are required by section 650 to meet on the third day after the election, canvass the votes and the returns thereof from the several election districts, and to make and file with the auditor their certificate, setting forth the number of votes cast in each district in favor of the removal, and the number cast against removal, the totals for and against, "and the majority in such county for or against such change. And if fifty-five per cent. of the votes cast at such election shall be in favor of changing the county seat * * * to the place named," it is deemed changed. Section 651 provides for a period of repose by prohibiting any action upon a completed petition until after the expiration of five years from the date of an election upon the question.

We have dwelt upon the peculiar features of this law for the purpose of emphasizing our statement that it was the intent and design of the lawmakers to hedge it about with safeguards sufficient to prevent a county seat from becoming a mere football, to be frequently kicked about from one point to another, at the caprice of a mere majority of the voters. It was carefully provided that, even to procure a submission of the question to the people, there should be clear proof that, after due deliberation,

legal voters of the county, equal in number to not less than three-fifths of those who had exercised the right of suffrage at the preceding election (no distinction being made between intelligible and unintelligible ballots), demanded to have it submitted; and, further, that, of those who vote at the special election, a decided majority must express themselves in favor of the change before a removal can be had. Having in mind this purpose of the legislature, as indicated in all of the carefully drawn provisions of the law, and also that in the Slingerland Case it was held, in effect, that, in determining for petition purposes the whole number of votes cast at the preceding election, an undecipherable ballot deposited in the box is a vote cast, if the name of the depositor appears on the poll list, we now proceed to ascertain in what manner it shall be determined whether the required 55 per cent. of the votes have been cast in favor of removal. It is also to be remembered that the burden is upon those who insist that the proposition has secured the specified percentage to show it.

Unquestionably, the general rule is correctly stated in Dayton v. City of St. Paul, 22 Minn. 400, that an election or a voting, whenever called for, is to be determined by the votes of those who vote to fill the office which is to be filled, or for or against the proposition which is to be adopted or rejected, and not by counting on either side those who do not vote at all. The late chief justice, who wrote the opinion, there remarks: [3] "To take a case out of this general rule requires a clearly manifested intention to apply a different one, and in two instances we find that the framers of the constitution have clearly manifested such an intention." This reference was to Taylor v. Taylor, 10 Minn. 81 (107), and Bayard v. Klinge, 16 Minn. 221 (249), in which that part of section 1, art. 11, of the constitution, relating to the removal of county seats (now abrogated by amendments,—sections 33 and 34, art. 4), was involved.

While the general rule as above stated has been adopted, with very few exceptions, by all of the courts of this country, its application has been almost universally in contests growing out of elections held to fill offices, in which vacancies would occur if there

---

[3] At page 403.

was no election; or the application has been in cases where, in connection with measures submitted to the voters for adoption or rejection, the elections have been to fill offices. We find no case in which the general rule has been applied in a contest growing out of an election at which a single measure or proposition has been submitted to the voters under a statute so peculiar in its various provisions as the one now under consideration. It is true that it is not expressly provided in this statute that unintelligible ballots shall be treated as votes cast either one way or the other; but if the majority required for petition purposes by section 647 means, as we have held, 60 per cent. of the whole number of voters who cast their ballots at the preceding election, whether such ballots were intelligible or unintelligible, it would seem to follow logically that, in ascertaining the result, ballots cast of the same character must be considered. As an indication that this was the intention and design, we call attention to section 650, wherein it is provided that the county commissioners shall canvass the votes and the returns thereof, and among these returns so to be canvassed are all ballots, defective as well as complete, and also the poll lists. It is from the votes cast and from the returns that the commissioners are to determine the result. From the whole tenor of the act, it seems apparent that no distinction was attempted to be made between "ballots" and "votes," and that the technical difference between "ballots cast" and "votes cast" was not in mind; between voters who expressed their choice on the proposition so intelligently as to leave no uncertainty in the minds of those who composed the town canvassing boards or the county board, or in the mind of the court before which a contest might be brought for trial, and voters who, in attempting to express such choice, were less fortunate than their neighbors.

If we do not take this view of the act, serious complications might arise, adding to the turmoil which usually attends an election of this character. A town canvassing board might decide one ballot unintelligible, and thus be able to have it appear prima facie that the proposition for a removal had received the necessary majority; while the county canvassing board might hold this same ballot intelligible, or against the proposition, thus defeating it; while the trial court might reverse the conclusion of the county

board, either by taking a different view of the intention of the voter who cast this ballot, or by concluding that his intention or choice was not ascertainable from the ballot. Again, if this construction is not placed upon the act, it might easily happen that a minority of the legal voters of the county who attended the polls for the sole purpose of expressing their views upon a very important measure, who attempted so to do by depositing their ballots, whose names appeared upon the poll lists and in the returns as having voted, and who are regarded for every other purpose as having voted at the election, might cause the removal of a county seat, and thus overcome the unmistakable design of the removal act. Such a construction, so opposed to the intent and spirit of the law, should not obtain if it can reasonably be avoided.

Our conclusion is that, for the purpose of determining what votes have been cast on the proposition, unintelligible as well as intelligible ballots must be considered, and that it must affirmatively appear, to effect a removal, that 55 per cent., at least, of all votes or ballots cast, including the unintelligible, are in favor thereof.

Judgment reversed.