LOUIS J. HOPKINS v. CITY OF DULUTH and Others.[1]

August 13, 1900.

Nos. 12,232—(271).

**Const. art. 4, § 36—Submission of City Charters to Popular Vote.**

The constitutional amendment of 1898 (section 36, art. 4), providing for the submission of new charters or amendments to the voters of the localities interested, for ratification, is essentially republican, and is not in violation of article 4, § 4, of the federal constitution.

**Same—Wording of Submission to Vote.**

Words added to the statutory form of such submission, which extend the real meaning but do not change the sense thereof, do not vitiate such submission. State v. Stearns, 72 Minn. 200, followed.

**Ballots to Be Excluded.**

Fraudulent ballots, ballots with unintelligible marks, expressing no effective vote upon any subject of choice, as well as ballots upon which no markings have been made by the voter, should be excluded from the aggregate number upon which the requisite four-sevenths required by the constitutional amendment is to be estimated, in determining the ratification of a proposed charter.

**Smith v. Board Distinguished.**

The case of Smith v. Board of Co. Commrs., 64 Minn. 16, considered and distinguished.

**City of Duluth—New Charter.**

*Held*, upon the findings of fact, which fully sustain the conclusions of law adopted by the trial court, that the new city charter of Duluth was legally ratified.

[1] Reported in 83 N. W. 536.

Election contest in the district court for St. Louis county instituted by Louis J. Hopkins against the city of Duluth to test the question whether a proposed charter for said city submitted at a general election had been ratified by four-sevenths of the qualified voters voting at such election. John Boyer on his own petition was made party to the proceeding as contestee. The matter was tried before Dibell, J., who made findings of fact, and as conclusion of law found that the charter had been duly ratified. From an order denying a motion to amend the findings of fact and conclusions of law, and also from an order denying a motion for a new trial, contestee Boyer appealed. Affirmed.

*John A. Keyes*, for appellant.

*Greene & Wood*, for contestant respondent.

LOVELY, J.

This is an election contest over the new city charter of Duluth. The contestant, Hopkins, appealed to the district court of St. Louis county from the action of the proper authorities declaring that the charter had failed of ratification. A recount of the ballots was ordered. Upon stipulations as to the character of certain ballots and a judicial recount of the others, the court below held that the charter received sufficient votes to secure its adoption. Upon motion by the contestee, Boyer, to set aside the findings, which was denied, this appeal brings up the issue whether at the election held in the city of Duluth February 6, 1900, the proposed charter, submitted under section 36 of article 4 of the constitution (amendment of 1898), received a sufficient number of votes to insure its legal ratification.

Two preliminary questions are urged by the contestee, which may be briefly disposed of. It is insisted that the constitutional amendment under which this charter was submitted is violative of section 4, article 4, of the federal constitution, because it provides for an apparent departure from a republican form of government. The section referred to provides that

"The United States shall guarantee to every state in this Union a republican form of government; and shall protect each of them against invasion," etc.

The purpose of this guaranty was to protect a union founded upon republican principles against aristocratic and monarchical innovations. Cooley, Const. Lim. 24. At the close of the Civil War this guaranty was made the subject of much discussion in congress, partaking of a political character, in the efforts towards reconstruction. It is a federal guaranty, to be exercised by federal, rather than state, authority. The conditions and necessities of its exercise are as yet quite abstract and theoretical, and it is not easy to see how its application here is of any particular consequence. It will be admitted, however, that this state cannot supplant its republican form of government by "aristocratic and monarchial innovations," upon principles inherent in the nature of the government, but it may change its constitution in any way consistent with its own fundamental law; and we are unable to see the force of the suggestion that the amendment of 1898 is not republican in form as well as spirit. It is true that, by the submission of charters and amendments to municipalities in the manner provided for by the amendment, a change is effected; but it is a change that by every historical sanction, from the earliest times, is republican in form and essence. The federal as well as the state government is representative in character, although the people do not directly vote upon the adoption of the laws by which they are governed. Yet it cannot be said that, if they were able to do so, a provision to effectuate that purpose would not be republican. We apprehend that a little reflection must satisfy any one that the advantage of providing local self-government by the voters directly interested, through a "referendum," is abstractly as well as concretely more republican than through representatives of the people in the legislature, many of whom are not at all interested in the affairs of the given locality.

The suggestion that the constitutional amendment authorizes a submission of a charter and amendments thereto through the instrumentalities of a commission has no weight, so long as the final adoption depends upon the exercise of the elective franchise. The test of republican or democratic government is the will of the people, expressed in majorities, under the proper forms of law. Every proposal for a change of government must of necessity be submitted, either directly or indirectly, through a designated origin,

whether it be upon the motion of one or of more persons, upon the instance of the individual citizen or a number; but so long as the ultimatum of decision is left to the will of the people, at the ballot box, it is essentially republican, and the theoretical distinction urged by the learned counsel for the contestee practically amounts to no more than this, that the change provided for is new and radical. It may turn out that the amendment is beneficial or otherwise, yet its tendency is clearly republican, and must be upheld by the court.

The proposed charter was submitted upon the ballots provided for under the law, in the following terms:

"Shall the proposed new charter of the city of Duluth, returned by the mayor of said city on January 8, 1900, be ratified?"

Exception is taken to this language, because by the terms of Laws 1899, c. 351, § 4, to effectuate the constitutional amendments, the words, "of the city of Duluth, returned by the mayor of said city, January 8, 1900," are added, while in the enabling act the language of the submission should be,

"Shall the proposed new charter of the city of Duluth be ratified?"

The additional words of the submission were merely descriptive in character, need not have been included, add nothing to the intelligent meaning of such submission, and the same was valid under the former rule of this court. State v. Stearns, 72 Minn. 200, 217, 75 N. W. 210.

At the election in question four distinct subjects of choice were submitted to the voters of that city upon a single ballot, viz.: Three candidates for mayor, two for aldermen, a proposition for issuing water and light bonds for the city, and the proposition for the ratification of the charter, which is the subject of this contention. The names of the mayoralty and aldermanic candidates, as well as the two propositions referred to, were properly placed on the ballot, that the voters might express by appropriate designations their respective wishes in the polling booths in accordance with the terms of the election laws of this state. Under the findings of fact by the trial court, which are supported by evidence, and do not seem to be

disputed, 6,707 ballots were deposited in the ballot boxes by the voters, which is the aggregate number for consideration in estimating whether the new charter received the requisite number of votes to secure its ratification, which the constitutional amendment provides shall be "four-sevenths of the qualified voters voting at such election." Article 4, § 36, Const. Minn. (Laws 1899, page v). Upon a number of these ballots it was disclosed upon the final count that there had been no choice expressed upon the proposition for ratification, and, if such ballots are excluded, the charter was unquestionably ratified by a very considerable addition in number to the four-sevenths required by the amendment.

Whether the proper estimate should be the vote for or against the proposition excluding in the count all ballots, where the voters expressed a choice on other subjects than the charter, is a question which, under the authorities, is ,open to considerable controversy. It was discussed with much ability by counsel, in view of its probable consideration by this court in the determination of this case; but we do not think it necessary to decide this appeal upon that contention, for, upon the view we take, a sufficient number of ballots were cast which must be excluded from the total number to sustain the charter by the constitutional four-sevenths provided for in the amendment. Of the total number of ballots cast, twenty-six were excluded by the court for reasons hereafter stated, and, if this exclusion was justified, the charter was duly ratified, and it is unnecessary to enter upon the discussion of the involved and somewhat complicated question of construction, under the decisions upon the issue whether the real test would be whether only such voters voting upon the proposition of the ratification should be counted in estimating the requisite majority.

Of the twenty-six ballots thus excluded by the trial court, five had either the names or initials of the voters casting them written thereon, and clearly indicated such evidence of identification of the persons casting such ballots as constituted a plain and palpable fraud upon the election law. They were not counted, although expressing in each case the voter's choice in certain respects. Pennington v. Hare, 60 Minn. 146, 62 N. W. 116; Truelsen v. Hugo, supra, page 73. That the identified ballots thus deposited should

81 M.—13

be excluded from the total vote is the only reasonable inference that follows from the application of the doctrine of these cases. The fraud which nullifies the choice expressed on these ballots must logically vitiate their use for any purpose. They were void. It necessarily follows that the poll list cannot be regarded as absolute evidence of the aggregate vote upon which the constitutional majority is to be estimated.

Of the twenty-six ballots excluded by the trial court, fifteen had markings upon them, but expressed no effective choice for any candidate, or upon either the bond proposition or the ratification of the charter. The voters who deposited these ballots did not by any mark or indication, even under the liberal construction of this court in the recent case of Truelsen v. Hugo, supra, express a choice. Their ballots were unintelligible and meant nothing. The effort of the voter in each instance to avail himself of his right of franchise amounted to nothing, and the most we can say for each of these ballots is that it was a mere attempt to vote, and could not be counted, and none of them was in fact counted. Six other ballots were totally blank, which the voters, without the use of the pencil in any way, deposited in the ballot box. The fraudulent ballots, the fifteen ballots with unintelligible markings, and the six blank ballots, together constituted the twenty-six excluded by the trial court from the total number.

It is urged for the contestee that, under the authority of this court in Smith v. Board of Co. Commrs., 64 Minn. 16, 65 N. W. 956, such exclusion was wrong; but we think that a brief consideration of the issue in that case, and the reasons upon which it was decided, fully justify the action of the trial court. The contest in that case was upon the change of a county seat, which must in all cases be at a special election, and the removal must be carried, under the express terms of the statute, by "55 per cent. of the votes cast." In that case it was held, for reasons that were peculiar to the character of such a contest, that the necessary safeguards which the statute relating thereto, in its various provisions, requires, "to prevent a county seat from becoming a mere football, to be frequently kicked about from one point to another" by caprice and to give to the

existing county seats "some degree of permanence," demanded a strict construction of the language of the statute designating the majority by which the removal should be carried. The entire opinion of the court is permeated with this view, and expresses several substantial reasons why a different rule might obtain in such a case, other than was applied in Dayton v. City of St. Paul, 22 Minn. 400, where it was held that ordinarily, in voting for a candidate or for or against a proposition which is to be adopted or rejected, the votes to be counted on either side should be those cast for or against such candidate or for or against such proposition. The whole tenor of the county seat removal statute was held to show "a clear design to prevent frequent changes, or any change at the behest of a mere majority"; and the statutory requirements, from the institution of proceedings for the removal of the county seat, to the final count of the votes, are reviewed in the opinion of the court, with care to show that the intent of the legislature to safeguard the rights of existing county seats, and to prevent danger from efforts to change them, required a strict construction of the language providing that "55 per cent. of the votes cast" is necessary to effect such removal; and the practical result is reached that it was within the legislative intent, in view of all the provisions of the removal law, that the words "votes cast" were used as the equivalent of "ballots cast," and the reasoning of the court fully justified that conclusion.

The case under consideration here is clearly distinguishable, the vote upon the charter is not required to be at a special election, the proposal for the ratification may be joined with issues upon the election of candidates for office or other propositions, and there is no means, as in the case of a single question or person voted for, of clearly determining whether the electors, who went to the polls and were checked upon the poll list as voters, had any interest in the ratification of the charter, save by the final count of the ballots. The necessity of changing charters to meet the demands of progress in municipal growth is obvious, and there is nothing to be found in the law providing therefor that indicates in the least a spirit of opposition to such change. The amendment provides that "four-sevenths of the qualified voters voting" shall be sufficient,—this,

evidently, for the purpose of giving to the proposed change of the municipal law a solidity and strength which it might not be supposed to have, were it adopted by a majority; and it would seem that the law, having thus expressed a significant requirement in the number needed to secure the adoption of the charter, would, were it necessary to add other requirements, have clearly expressed the same; for, as suggested by the court in Dayton v. City of St. Paul, supra, "to take a case out of this general rule requires a clearly manifested intention to apply a different one," and we do not think that such intention can be found in the constitutional amendment referred to, as it is in the statute construed in the case of Smith v. Board of Co. Commrs.

But there is a still more significant reason for our view, by a comparison of the language providing for the final count in county-seat contests and upon the ratification of municipal charters. In a county-seat removal "55 per cent. of the votes cast" are needed to secure the change, but for the ratification of a charter "four-sevenths of the qualified voters voting at such election" shall be sufficient. The word "votes," in the Renville County-Seat case, was treated as equivalent to "ballots." It does not seem reasonable to apply a similar test to the words of the amendment, "qualified voters voting at such election." To do so would be to hold that any person who had passed into the voting booth, and whose name had been checked upon the poll list, had voted, though he had expressed no choice for any one, or upon any question or proposition, and would give to a bare attempt on his part to vote, or a fraudulent vote, a substantial effect,—as much as if the voter had voted, when he had not voted at all. We cannot go to this extent. We do not think that it was within the intent of the amendment, nor fairly inferable from its language, that such a construction should be given to it; and we hold that a bare attempt to vote, by depositing a blank ballot or an unintelligible ballot, is not effective, and should not be included in the total count upon which the required four-sevenths is to be estimated, and that the court below properly excluded the twenty-six votes from the aggregate number cast, and it follows

that the new charter of Duluth was legally ratified by the constitutional majority.

Order affirmed.