[No. 11038.    Department Two.    March 8, 1913.]

THE STATE OF WASHINGTON, *on the Relation of Thomas Short, Mayor, et al., Plaintiff,* v. C. W. CLAUSEN, *State Auditor, Respondent.*[1]

ELECTION—BALLOTS—MAJORITY—THREE-FIFTHS OF QUALIFIED VOTERS—REJECTED BALLOTS. Under Rem. & Bal. Code, § 8006, requiring an affirmative vote in a municipal bond election, by three-fifths of the qualified voters voting at the election, ballots improperly cast or rejected are not to be counted in determining the total vote cast (CROW, C. J., dissenting).

Application filed in the supreme court February 17, 1913, for a writ of mandate to compel the state auditor to issue a warrant. Granted.

[1]Reported in 130 Pac. 479.

*F. W. Greenman*, for relators.

*The Attorney General* and *R. E. Campbell, Assistant*, for respondent.

MORRIS, J.—Relators, as officials of the town of Milton, apply for a writ of mandate to respondent, to compel the issuance of a warrant in the sum of $5,500, in payment of water bonds purchased by the state. The warrant was refused on account of a doubt as to whether or not the bonds received the necessary three-fifths affirmative vote. In determining this question, we are called upon to decide whether ballots rejected as unintelligible or illegal should be counted in ascertaining the total number of votes cast in the submitted proposition. The language of the statute governing matters of this kind, as found in § 8006, Rem. & Bal. Code, is "and such proposition shall be adopted and assented to by three-fifths of the qualified voters of the said city or town voting at said election."

We have found some conflict in the authorities, but a careful examination convinces us that the decided weight of authority is to the effect that ballots improperly cast; or rejected because of illegality or unintelligibility, cannot be counted in determining the total vote cast. We shall not attempt to review all the authorities submitted to us, nor discuss the various reasons advanced by those courts reaching a different conclusion from the one we adopt. One of the latest cases upon a like question is *Town of Eufaula v. Gibson*, 22 Okl. 507, 98 Pac. 565, upon which respondent places strong reliance. This was a county seat removal case, and the requirement of the statute was "a majority of all votes cast." It was held that, under the peculiar language of this requirement, all ballots, whether defective or not, should be counted in ascertaining this majority. The court in so holding reviews many cases and distinguishes its statute from a requirement reading, "If a majority of said electors shall ratify the same," as construed in *In re Denny*, 156 Ind. 104, 59 N. E. 359, 51

L. R. A. 722, or "whenever a majority of the electors voting shall so determine," as in *People v. Town of Berkeley*, 102 Cal. 298, 36 Pac. 591, 23 L. R. A. 838, and *People v. Brown*, 11 Ill. 478, or "a majority of the legal voters;" as in *State v. Winkelmeier*, 35 Mo. 103, or "If a majority of the electors qualified to vote . . . voting thereon shall approve," as in *Bott v. Secretary of State*, 62 N. J. L. 107, 40 Atl. 740; and seems to agree that, in the face of such requirements, those cases state the correct rule in holding that only those ballots entitled by law to be counted for or against the proposition, can be counted in determining the required majority. The New Jersey court, in the last cited case, also recognizes such a distinction, and says:

"To sustain the contention that, in the determination of the board of state canvassers, the number of names on the poll books, which included the votes given for and against each proposed amendment, as well as the number of ballots rejected, should be considered in ascertaining the majority, *Slingerland v. Norton* (Minn.), 61 N. W. 322, and *Smith v. Board of Commissioners of Renville County*, 65 N. W. 956, were cited. Those decisions were made upon a statute submitting to an election the question of the removal of county seats, which provided that, if fifty-five per cent. of the votes cast at such election shall be in favor of changing the county seat to the place named the change shall be made. The court, on a construction of the words, 'votes cast,' held that the majority was to be ascertained from all the ballots that were cast at the election, although some of the ballots could not be deciphered, or counted either for or against the proposed change of the county seat. Decisions of which the cases cited are types have no relevancy to the construction of our constitution. The constitutional provision does not require a majority of the voters who are admitted as such at the election and who in fact exercise or attempt to exercise the elective franchise. The certificate of the number of votes received by the several election boards is presumptive evidence that the persons by whom they were cast were qualified voters. But that concession does not dispose of this question. The constitution requires that the approval and ratification of any amendment shall be by a majority of electors who are not

only qualified to vote, but who did actually vote upon such amendment—that is, qualified voters whose ballots were entitled by law to be counted in declaring the result of the election either for or against the amendment. Though a qualified voter succeeds in getting his name on the poll list, and a ballot in the ballot box, he is not a voter voting on the amendments unless his ballot is such as is prescribed by law and conforms to the general law regulating elections. The act contains no provision for the certificate and return of the ballots that were rejected, nor does it provide for an inquiry, either before the county boards of election or before the board of state canvassers with respect to the grounds upon which votes have been rejected, nor are either of these boards empowered to embody in their official action any results other than such as are exhibited by the official statements produced before them. The ballots returned as rejected must be taken to have been properly rejected, and consequently are to be excluded from the computation of the votes cast for or against the amendments. Such ballots are simply nullities."

Referring now to the language of our statute requiring an affirmative vote by "three-fifths of the qualified voters . . . voting at said election," it is apparent, we think, that such language is within the rule of the *Bott* and other cases above cited, rather than within that of the *Eufaula* case. In fact, there is little if any distinction between the language in the *Bott* case, "the electors qualified to vote . . . voting thereon," which the *Eufaula* case says calls for a different rule than the one it announces, and the language of our statute "the qualified voters . . . voting at said election." So that it may almost be said that the *Eufaula* case, after reviewing a vast number of authorities, is authority for our holding that, under language such as ours, illegal or rejected ballots shall not be counted. Respondent also relies upon *State ex rel. Hocknell v. Roper*, 46 Neb. 724, 61 N. W. 753; *Id.*, 46 Neb. 730, 65 N. W. 802, another county seat removal case, where under the provision "any place receiving three-fifths of all the votes cast shall become and remain the county seat," it was held that void and unintelligible bal-

lots should be counted in determining the result. The same case and question, we find, were subsequently submitted to the court in *Id.*, 47 Neb. 417, 66 N. W. 539, and upon a re-examination the court was convinced of its error in so ruling, and then held that rejected and unintelligible ballots could not be considered in determining the result. *Smith v. Board of Commissioners of Renville County*, 64 Minn. 16, 65 N. W. 956, is also cited by respondent. This was also a county seat removal case. The statute provided that the proposition must receive "55 per cent of the votes cast," and it was held "votes cast" was equivalent to ballots cast, and all ballots cast, whether good or bad, should be counted. The court bases its opinion upon the evident intent of the legislature in view of all the provisions of the removal statute. The same court later on, in *Hopkins v. Duluth*, 81 Minn. 189, 83 N. W. 536, in a case involving the submission of a new municipal charter, where it was provided that the proposition must receive the affirmative vote of "four-sevenths of the qualified voters voting at such election," held that unintelligible ballots should be excluded in arriving at the result, saying in referring to these rejected ballots: "The effort of the voter in each instance to avail himself of his right of franchise amounted to nothing, and the most we can say for it is that it was a mere attempt to vote and could not be counted." The court then proceeds to distinguish this ruling from its former ruling in the county seat removal case, and defends its former ruling upon the peculiar situation presented in cases of that character calling for the announcement of such a rule. The court's distinguishment of the two cases must be accepted, or the latter case must be regarded as overruling the former. It will be noted that the statutory requirement considered in the latter case is in effect identical with the provision of our statute.

In *Wightman v. Village of Tecumseh*, 157 Mich. 326, 122 N. W. 122, the requirement considered was a "two-thirds vote of the electors voting upon the question." Fifty-five ballots

were rejected as illegal because of distinguishing marks, and it was held that, under this requirement, these rejected ballots could not be counted in determining whether or not the submitted proposition had received the necessary two-thirds affirmative vote. Discussing this holding, it is said:

"Complainant . . . insists that the legal electors voted these ballots, and therefore they should be counted in estimating the two-thirds vote. In other words, he insists that these votes were valid for one purpose, but void for all others. The position is untenable. The statute makes all such votes void. A void vote is of no more effect than no vote."

A like rule is announced in *Murdoch v. Strange*, 99 Md. 89, 57 Atl. 628, where it is said: "The overwhelming weight of authority is in favor of these views." Similar views upon like questions are found in: *Catlett v. Knoxville, S. & E. R. Co.*, 120 Tenn. 699, 112 S. W. 559; *Battle Creek Brewing Co. v. Board of Suprs. of Calhoun County*, 166 Mich. 52, 131 N. W. 160; *Attorney General v. Board of Suprs. of Genesee County*, 166 Mich. 61, 131 N. W. 163; *State ex rel. McCue, v. Blaisdell*, 18 N. D. 31, 119 N. W. 360.

It is clear, we think, in considering whether or not any like submitted proposition has received the requisite affirmative vote, that only those ballots that express the voter's choice with such clearness that the ballot can be counted either for or against the submitted proposition, can be counted in the totals. The requirement contemplates two ballots only, one affirmative and the other negative. To adopt the other rule would be to say that three ballots were contemplated. One affirmative, one negative, and the other neither affirmative nor negative, but forming a new class into which all ballots for any reason void must go. Nothing of this kind was ever contemplated by the legislature. In demanding a three-fifths affirmative vote, the essential requirement was intended to mean the affirmative votes should exceed the negative votes by one-fifth. To make the requirement read, the affirmative votes

should exceed the negative votes, plus all other votes, by one-fifth, is to read into the statute something not there nor intended to be there.

Let the writ issue.

MAIN, ELLIS, and FULLERTON, JJ., concur.

CROW, C. J. (dissenting)—As stated in the majority opinion the statute, Rem. & Bal. Code, § 8006, requires that "such proposition shall be adopted and assented to by three-fifths of the qualified voters of the said city or town voting at said election." In other words, the mandate of the statute is that the affirmative assent of three-fifths of all qualified voters voting at the election shall be required to adopt the proposition. It is conceded that the proposition did not receive the requisite three-fifths, unless the electors who cast the so-called unintelligible ballots and who were qualified voters, are to be ignored, or held not to have voted at the election.. I am of the opinion that, in contemplation of the statute, they did vote at the election, that the proposition failed to carry, and that the writ should not issue. I therefore dissent.