## HERMAN EIKMEIER AND OTHERS v. JOHN STEFFEN AND OTHERS.[1]

December 3, 1915.

Nos. 19,584—(201).

**County option — construction of 1915 act.**

In order to adopt a proposition to prohibit the sale of liquor within a county, submitted to the electors thereof under chapter 23, Laws of 1915, known as the county option law, a majority of all votes cast at the election must be in favor of such proposition; and it is *held*, following McLaughlin v. Village of Rush City, 122 Minn. 428, that, in determining the total number of votes cast at such election, defectively marked ballots as well as properly marked ballots must be counted.

[1]Reported in 155 N. W. 92.

Herman Eikmeier and others, legal voters in the county of Pipestone, appealed to the district court for the county from the canvass and declared result of the county canvassing board of that county of the election held on June 7, 1915, under the provisions of Laws 1915, p. 24, c. 23, on the question whether the sale of intoxicating liquor should be prohibited, wherein the canvassing board declared there were 1,069 votes in favor of and 1,073 votes against the proposition. The county of Pipestone and its auditor appeared and prayed that the appeal be dismissed. John Steffen and others, qualified electors of the county, also appeared and filed an answer to the notice of contest. The appeal was heard before Quinn, J., who made findings as stated in the first paragraph of the opinion, and ordered judgment setting aside the certificate of the county canvassing board. From the judgment entered pursuant to the order for judgment, John Steffen and the additional contestees appealed. Reversed.

*L. R. Frankel* and *D. E. Dwyer,* for appellants.

*George P. Gurley,* County Attorney, *A. J. Daley* and *Morris Evans,* for respondents.

*Frank E. Putnam* and *W. I. Norton,* as *amici curiae,* filed a brief in behalf of respondents.


TAYLOR, C.

On June 7, 1915, an election was held in the county of Pipestone under chapter 23, p. 24, of the Laws of 1915, known as the county option law, to determine whether the sale of intoxicating liquor should be prohibited within that county. The canvassing board certified that 2,150 votes were cast at the election, and that 1,069 thereof were in favor of such prohibition and 1,073 thereof were against such prohibition. Certain voters duly instituted a contest, and, as a result of the trial thereof, the court found that 2,154 ballots were cast at the election; that three of them were cast against prohibiting the sale of liquor by men who were not qualified voters; that seven others bore the name or initials of the voter for the purpose of identification; that seven others were so defectively marked that the intention of the voter could not be ascertained therefrom; that these 17 ballots should be deducted from the total number of 2,154 deposited in the ballot box, leaving 2,137 as the actual num-

ber of legal votes cast upon the proposition submitted at the election; that of these legal votes 1,070 were in favor of prohibiting the sale of liquor and 1,067 were against prohibiting such sale; and that the proposition to prohibit the sale of liquor had been adopted. Judgment was rendered in accordance with such findings and an appeal therefrom brings the matter before this court.

The question presented is whether a majority of the 2,137 legal votes actually cast upon the proposition at the election is sufficient to adopt the proposition, or whether the three ballots cast by nonvoters, the seven ballots marked for purposes of identification, and the seven unintelligible ballots, or any of them, must be counted in determining the number of votes of which a majority is required to adopt the proposition.

The statute provides: "If a majority of the votes at any such election be cast in favor of prohibiting the sale of intoxicating liquors then, and in that event, and not otherwise," such sales shall be prohibited. Provisions more or less similar have been considered and construed in a number of cases which we will examine in their chronological order. The Constitution provided in section 1 of article 11 that all laws "for removing county seats shall, before taking effect, be submitted to the electors of the county * * * at the next general election after the passage thereof, and be adopted by a majority of such electors." This provision was considered and construed in Taylor v. Taylor, 10 Minn. 81 (107) ; Bayard v. Klinge, 16 Minn. 221 (249) ; and Everett v. Smith, 22 Minn. 53, and the court held that to change a county seat a majority of all the electors voting at the election was required, not merely a majority of those voting upon that proposition, and that a statute declaring that a majority of those voting upon that proposition should be sufficient to effect the change was nugatory.

Before section 1 of article 14 of the Constitution had itself been amended, it provided that proposed alterations or amendments to the Constitution "shall be submitted to the people for their approval or rejection; and if it shall appear in a manner to be provided by law that a majority of voters present and voting shall have ratified such alterations or amendments, the same shall be valid to all intents and purposes, as a part of this Constitution." This provision was under

131 M.—19.

consideration in Dayton v. City of St. Paul, 22 Minn. 400, and the court said: "The doubt is as to what is intended by the words 'voters present and voting' * * *. We are of opinion that the words refer to the voters who are present and vote upon the proposition submitted to the electors, without respect to those who may be present and vote for other purposes," and proceed to call attention to the difference between the language used here and the language considered in Taylor v. Taylor, 10 Minn. 81 (107).

After the adoption of the constitutional amendment prohibiting special legislation, the legislature passed a general law which provided that, upon the filing of a specified petition for changing a county seat, the proposition for such change should be submitted at a special election, and which further provided that "if fifty-five per cent of the votes cast at such election shall be in favor of changing the county seat of such county to the place named in said petition, such county seat shall, subject to the provisions of this act, be deemed to be thereby changed to the place named in said petition." G. S. 1894, § 650. This provision was construed in Smith v. Board of Co. Commrs. of Renville County, 64 Minn. 16, 65 N. W. 956. At the election there in question 68 unintelligible ballots had been cast, which could not be counted either for or against the proposition to change the county seat. If these unintelligible ballots were to be counted as a part of the votes cast, the proposition had failed to receive the necessary "fifty-five per cent of the votes cast at such election." The court say: "Our conclusion is that, for the purpose of determining what votes have been cast on the proposition, unintelligible as well as intelligible ballots must be considered, and that it must affirmatively appear, to effect a removal, that fifty-five per cent, at least, of all votes or ballots cast, including the unintelligible, are in favor thereof."

The case of State v. Stearns, 72 Minn. 200, 75 N. W. 210, considered, among other things, whether chapter 168, p. 378, of the Laws of 1895, relating to the taxation of railroad lands, had been ratified at the general election at which it was submitted. Section 32a of article 4 of the Constitution provided that, before the act should take effect, it should "be submitted to a vote of the people of the state, and be adopted and ratified by a majority of the electors of the state voting at the

election at which the same shall be submitted to them." The court say: "By virtue of the Constitution, it was not adopted and ratified, unless a majority of all the electors who voted at the election voted for it. A majority in favor of it of all the votes cast upon the proposition is not sufficient." In Hopkins v. City of Duluth, 81 Minn. 189, 83 N. W. 536, the question involved was whether the charter of the city of Duluth had been adopted by the requisite vote. The Constitution (art. 4, § 36), after providing the manner in which a proposed charter should be prepared, further provided: "Such charter shall be submitted to the qualified voters of such city or village at the next election thereafter, and if four-sevenths of the qualified voters voting at such election shall ratify the same it shall, at the end of thirty days thereafter, become the charter of such city." There were five ballots which bore the name or initials of the voter for the purpose of identification and were consequently void; there were 15 ballots so defectively marked that they expressed no choice for any candidate or any proposition, and there were six ballots wholly blank. If these 26 ballots were excluded in determining the number of "qualified voters voting at such election," the charter had been ratified by the requisite vote. The court held that the voters depositing these ballots did not vote at the election and that the charter had been adopted. The court also held that this case was distinguishable from the case of Smith v. Board of Co. Commrs. of Renville County, 64 Minn. 16, 65 N. W. 956. A little over a year after this decision, the question as to whether certain proposed amendments to the Duluth charter had received the requisite vote to ratify them came before the court and was considered in State v. Hugo, 84 Minn. 81, 86 N. W. 784. This election was governed by the same section of the Constitution considered in the Hopkins case, but "three-fifths of the qualified voters of such city or village voting at the next election" were required to adopt the amendments, instead of the four-sevenths required to adopt the original charter. The proposition to adopt the amendments received more than three-fifths of the votes cast upon that proposition, but less than three-fifths of all the votes cast at the election for other purposes. The court reviewed the prior decisions construing constitutional provisions, except the Hopkins case to which no reference was made, distinguished Day-

ton v. City of St. Paul, 22 Minn. 400, on the ground that that case turned upon the fact that the words "at said election," were omitted from the provision there considered; and held that three-fifths of "the qualified voters * * * voting at the next election," meant three-fifths of the total vote cast at such election for any purpose.

The case of State v. Village Council of Osakis, 112 Minn. 365, 128 N. W. 295, involved the local option law governing villages, and the construction of the provision found in section 3142, G. S. 1913, which forbids the sale of liquor "in any town or municipality in which a majority of votes at the last election at which the question of license was voted upon shall not have been in favor of license." The village of Osakis had voted upon the license question and a majority of the votes cast upon that question had been in favor of license, but the number of votes in favor of license were not a majority of all the votes cast at the election for all purposes. The court held that the statute prohibited licensing the sale of liquor, unless a majority of all the votes cast at the election for any purpose were in favor of such license, and that no license could be issued by the village council for the reason that the proposition had not received such majority.

The city of Ada voted upon the license question under a charter which provided that, "if a majority of the votes cast at such election on *said question* shall be against license, no license for the sale of intoxicating liquors shall be granted by the authorities of the said city of Ada * * * but if the returns show that a majority of the votes cast at such election on *said question* be in favor of license, then the city council of the said city may grant" such licenses. A majority of the votes cast upon the license question were in favor of license but the number in favor of license was less than a majority of all the votes cast at the election. It was held in Thune v. Hetland, 114 Minn. 395, 131 N. W. 372, that the city had authority to issue licenses as the charter provided that the license question should be determined by a majority of the votes cast upon *that question,* and did not require a majority of all the votes cast at the election.

The charter of the city of Warren, after providing for submitting the license question to a vote at the city election and for canvassing the re-

turns of such vote, further provided that, "if such returns show a majority of the votes cast at such election to be against license, then in such case the city council shall grant no license * * * until * * * reversed in the same manner at a subsequent general election." The city voted against license and at a subsequent election again submitted the license question. At this second election, a majority of the votes upon that question were in favor of license, but the number in favor of license was less than a majority of all the votes cast at the election. It was held in Lodoen v. City Council of Warren, 118 Minn. 371, 136 N. W. 1031, that the above provision required a majority of all the votes cast at the election to prohibit the issuance of licenses in the first instance, and also required a majority of all the votes at the second election to reverse such action, and that the city of Warren was without authority to issue licenses.

In McLaughlin v. Village of Rush City, 122 Minn. 428, 142 N. W. 713, the provision of section 3142, G. S. 1913, construed in State v. Village Council of Osakis, 112 Minn. 365, 128 N. W. 295, was again under consideration. The village of Rush City had voted upon the license question at the village election, but had provided the usual ballot box and ballots for the votes for village officers, and a separate ballot box and separate ballots for the votes upon the license question. The same number of ballots, 228, were deposited in each ballot box. Of those in the ballot box provided for votes for village officers, one was claimed to be wholly unintelligible; of those in the ballot box provided for votes upon the license question, 114 were in favor of license, 112 were against license, and 2 were wholly blank. It was strenuously contended that the result of the vote upon the license proposition should be determined by the ballots in the ballot box provided for votes upon that proposition; that the wholly blank ballots were not votes and could not be counted as such, and that the proposition for license had been adopted. It was further contended that, if recourse were had to the other ballot box for the purpose of determining the total number of votes cast at the election, the alleged unintelligible ballot was not a vote and could not be counted as such; that only 227 votes had been cast in that ballot box and only 226 in the other, and that the proposition for license had received a majority of all the votes cast, whether the

total number of votes cast be determined by the vote for village officers or by the vote upon the license question. The alleged unintelligible ballot may not have been unintelligible and perhaps should have been counted for the candidates named thereon, but the court did not decide that question. The court said, in substance, that it was not necessary to decide whether the result should be determined by the number of ballots cast upon the license question, or by the number cast for village officers, as the same number of ballots had been deposited in each ballot box; that a majority of all the ballots cast, including both blank and unintelligible ballots, was required to authorize the issuance of licenses; and held that the proposition for license had not been adopted and that the village could not issue such licenses.

In Anderson v. City of Le Sueur, 127 Minn. 318, 149 N. W. 472, the statute providing for voting upon the license question in cities of the fourth class was under consideration. This statute provided that, "if a majority of the votes cast *upon the question* shall be in favor of license, then license for the sale of intoxicating liquors may be granted, but if such majority shall be against license then no license shall be granted." The license question had been submitted at the city election in the city of Le Sueur and a majority of the votes cast upon that question were in favor of license, but the number of these votes was not a majority of all the votes cast at the election. It was held that the statute required only a majority of those voting upon the question and that the proposition for license had been adopted.

In the cases where the law provided for the adoption of the proposition submitted to the electors by a majority of the votes upon *that question,* it was held that the result must be determined by the votes legally cast for or against such proposition, regardless of the votes cast for other purposes. Where this specific provision was lacking, it has been held in all the cases except Dayton v. City of St. Paul, 22 Minn. 400, and Hopkins v. City of Duluth, 81 Minn. 189, 83 N. W. 536, that a majority of all the electors voting at the election was required to adopt the proposition. In the Dayton case, the provision, "voters present and voting," was held to intend only those voting upon the proposition. In State v. Hugo, 84 Minn. 81, 86 N. W. 784, attention was called to the fact that the words, "at said election," were not in the provision under

consideration in the Dayton case, and while the words, "voters present and voting," had there been taken as meaning those voting upon the proposition, it was held that the words, *"voters * * * voting at the next election,"* in the provision under consideration in the Hugo case, could not be taken as intending those only who voted upon the proposition in question, but must be taken as intending all who voted at the election for any purpose. In the Hopkins case, it was held that ballots which expressed no choice for any candidate or any proposition, because either void, or wholly blank, or wholly unintelligible, were not within the intendment of the words, "voters voting at such election," in the provision there under consideration. In Smith v. Board of Co. Commrs. of Renville County, 64 Minn. 16, 65 N. W. 956, it was expressly held that unintelligible ballots must be counted in determining the total number of votes cast. In the Rush City case, the ruling in the Hopkins case was strongly pressed upon the attention of the court, but instead of adhering to that ruling, the court said: "The blank ballots, and those insufficiently marked, must be included in determining the total vote cast at the election." This is the last expression of the court upon that question. To hold in the instant case that the defectively marked ballots should be excluded in determining the total vote cast, would be to virtually overrule that case. It is important that a uniform rule should be followed in determining the result of such elections, in order that all concerned may be able to determine and know the result thereof without becoming involved in an acrimonious controversy thereover. The statute in question was enacted more than a year after the decision in the Rush City case. If the legislature had intended that the result of elections thereunder should be determined by a different rule, it would seem that they would have used language clearly indicating such intention. We feel constrained to follow and apply the rule announced in the Rush City case. It follows that the unintelligible ballots must be counted in determining the total vote cast at the election. See note found in 45 L.R.A.(N.S.) at page 714 in which it is said that Hopkins v. City of Duluth, supra, and State v. Clausen, 72 Wash. 409, 130 Pac. 479, 45 L.R.A.(N.S.) 714, are the only cases directly holding that unintelligible ballots should not be counted for such purpose. Adding these seven ballots to the 2,137,

concerning which there is no dispute, gives 2,144 as the total vote cast. As only 1,070 votes were in favor of the proposition, it failed to receive a majority and was not adopted. It is not necessary to decide whether the other disputed votes should be included or rejected in determining the total vote cast, as they would not change the result. But it is clear that ballots cast by persons not qualified to vote cannot be considered as votes cast at the election. It is also probable that a voter who, in violation of the law, intentionally marks his ballot for the purpose of identification, and thereby, by his own wrongful act, makes his ballot void, should not be considered as having voted at such election. A distinction is made in some of the decisions between unintelligible ballots and blank ballots, upon the ground that in one case the voter cast a ballot for the purpose of expressing his choice, but through some mischance failed to do so; while in the other case he made no attempt to express a choice, and for that reason should not be considered as voting at the election. It is also argued that where a majority of all votes cast at the election are required to adopt the proposition submitted, the voters understand that all ballots not in favor of the proposition, count against it, and that a voter who takes the trouble to go to the polls and cast a ballot, which does not express a choice in favor of the proposition, should be deemed to have cast it for the purpose of having it counted against such proposition, whether the ballot be unintelligible or even wholly blank. Whether the rule stated in the Rush City case should be limited so as to exclude ballots wholly blank is left for consideration when that question shall be directly involved.

Judgment reversed.


HOLT, J. (dissenting).

I dissent for the reason that I believe the legislature, by separating the county option election from all other elections, has indicated an intent not to make applicable the rule which, under previous local option laws, was adopted by the court in determining whether a majority of the total votes cast was in favor of or against the licensing of drinking places. It seems to me, under the present law, the negative and affirmative upon the county option proposition stand like two opposing

candidates at an election. The one securing the greater number of lawful votes prevails. This idea seems borne out by the form of certificate prescribed for the return to be made by the canvassing board.

HALLAM, J. (dissenting).

I dissent from the proposition that an unintelligible vote is to be counted as a "vote" in determining whether a majority of the votes at a county option election has been cast in favor of prohibition. The statute provides "the voter shall mark a cross in one of the * * * squares to express his choice." Laws 1915, p. 27, c. 23, § 7. It then provides "the ballots shall be * * * counted * * * in accordance with the law governing general elections for county officers." The law governing general elections for county officers provides "only those so marked shall be counted." G. S. 1913, § 460. The intent seems plain that only ballots marked as the statute provides shall be counted for any purpose.

The question whether blank or unintelligible ballots should be counted in determining the total vote cast has been considered in construction of other statutes. The latest case in which the question was involved is Anderson v. City of Le Sueur, 127 Minn. 318, 149 N. W. 472. That case arose under a license election held in the city of Le Sueur, held at the same time as the city election under a statute which provides: "If a majority of the votes cast upon the question shall be in favor of license, then license for the sale of intoxicating liquor may be granted." Laws 1913, p. 540, c. 387, § 3. The ballots on this issue were deposited in separate boxes. There were 446 ballots deposited; 222 were in favor of license; 214 against, and 10 blank. If blank votes were taken into account, license did not carry; if not, it did carry. In the brief of appellant it was contended [p. 24] that "blank ballots are ballots upon the question, and must be included in the determination of the total votes cast at the election," and McLaughlin v. Village of Rush City, 122 Minn. 428, 142 N. W. 713, which is the basis of the majority opinion in this case, was cited as authority. The court rejected the contention and said: "As a majority of the votes cast *upon the question* were in favor of license, the decision of the trial court was correct," (page 322), thus holding that the blank ballots were not to be taken into account. In this case the

ballots were not blank, but unintelligible, but this difference seems to me quite immaterial.

There is no difficulty in harmonizing the Le Sueur case with State v. Village Council of Osakis, 112 Minn. 365, 128 N. W. 295, and Lodoen v. City Council of Warren, 118 Minn. 371, 136 N. W. 1031. Those cases simply hold that, in determining what constitutes a "majority of the votes cast at such election," all votes cast for any purpose must be taken into account, but they do not touch the question of whether blank or unintelligible votes should be counted. I am not sure that the Le Sueur case can be harmonized with McLaughlin v. Village of Rush City, supra, but I am wholly unable to distinguish the case at bar from the Le Sueur case. The statute construed in that case reads: "If a majority of the votes cast upon the question shall be in favor" of the proposition it is carried. This statute reads: "If the majority of the votes at any such election be cast in favor"[1] of the proposition it is carried. I can see no difference that is material here. True, there is this difference, that in the 1913 statute we find the term "votes cast upon the question."[2] That term was important in the Le Sueur case as excluding from consideration votes cast upon other questions submitted at the same election. But it was not important for any other purpose. It has no bearing on the question as to what constitutes a vote, and it was not so held in the Le Sueur case, nor, so far as I know, in any other case. Except as excluding votes cast upon some other issue, "votes cast upon the question" and "votes cast at such election," mean one and the same thing. Surely it cannot be said that a blank or unintelligible ballot is a vote, and yet not a vote cast upon any question submitted for the suffrage of the voter at the election. In my opinion the judgment should be affirmed.

[1][Laws 1915, p. 28, c. 23, § 11.]

[2][Laws 1913, p. 541, c. 387, § 3.]