# IN RE PROCEEDING TO CONTEST RESULT OF ELECTION ON MINNEAPOLIS CHARTER AMENDMENT.
## ALFRED C. GODWARD v. CITY OF MINNEAPOLIS.[1]

November 3, 1933.

No. 29,548.

*Neil M. Cronin*, City Attorney, and *John T. O'Donnell* and *William H. Morse*, Assistant City Attorneys, for contestee-appellant.

*Ben W. Palmer*, for contestant-respondent.

*LORING, Justice.*

November 8, 1932, there was submitted to the voters of Minneapolis a proposed amendment to the home rule charter of that city. Lavender ballots containing the sole question as to whether this single amendment should be adopted were prepared and sub-

[1]Reported in 250 N. W. 719.

mitted to the voters on that day.  108,611 ballots were marked "Yes," 70,342 were marked "No," and 586 ballots were so marked as to be unintelligible and consequently could not be counted as either "Yes" or "No."  16,414 were left totally blank.  The canvassing committee reported that the amendment had not been accepted by the voters, and this report was adopted by the city council.  The respondent herein contested the result, and the trial court found that the necessary three-fifths of the voters had duly accepted the amendment to the charter and directed the mayor to certify, deposit, and record duplicate certificates setting forth the amendment and its ratification as required by law.  The city moved for a new trial and has appealed to this court from an order denying that motion.

■ Art. 4, § 36, of our state constitution provides that a charter of this character may be amended by a proposal by the board of freeholders, published for 30 days and "accepted by three-fifths of the qualified voters of such city or village voting at the next election and not otherwise."  1 Mason Minn. St. 1927, § 1286, provides that amendments to a home rule charter shall be submitted as in the case of the original charter, and § 1284 provides in regard to the original charter as follows:

"Upon delivery of such draft, the council or other governing body of the city or village shall cause the proposed charter to be submitted at the next general election thereafter occurring in said city or village within six months after the delivery of such draft, and if there is no general city or village election occurring in said city or village within six months after the delivery of such draft, then the council or other governing body of said city or village shall cause the proposed charter to be submitted at a special election to be held within ninety days after the delivery of such draft as aforesaid.  Provided, that said council or other governing body may call a special election for that purpose only at any time.  If said election is held at the same time with the general election, the voting places and election officers shall be the same for both elections."

The substance of the last sentence came into the law by L. 1903, c. 238. There is also a provision that the voter mark his ballot with a cross after either "Yes" or "No."

The city council in submitting the proposed amendment did not designate the election upon the amendment as a special election, but we have no difficulty on that account in construing that election in so far as it related to the acceptance and adoption of the amendment as being a special election. Whatever may be the situation where there is a general city or village election and the amendment is submitted at the same time, since L. 1903, c. 238, it is obviously the intention of the legislature that when the amendment to the city charter is submitted at the same time as a general election such as that held on November 8, 1932, the voting upon the amendment shall be considered to be a special election. The reference in the statute to "both elections" cannot be otherwise interpreted. In our opinion the trial court was correct in so holding.

Inasmuch as we construe the submission of the charter amendment as a special election occurring concurrently with the general election, we do not need to consider the total number of votes cast at the general election but only those voters who voted upon the proposed amendment using the lavender ballot.

■ Was the trial court right in excluding from the total number of votes the blank and unintelligible ballots? The appellant relies principally upon the case of State ex rel. Greene v. Hugo, 84 Minn. 81, 86 N. W. 784, and the respondent principally upon Hopkins v. City of Duluth, 81 Minn. 189, 83 N. W. 536. The Hopkins case is directly in point here. A home rule charter, together with other city matters, was submitted to the voters of Duluth. 6,707 ballots were deposited in the ballot boxes of that city. Four-sevenths were required for the adoption of the charter. Of the total number of ballots cast 26 were excluded by the court, 5 of them because they were identified by the initials of the voters, 15 because they had unintelligible markings upon them, and 6 because they were totally blank. The court held that the initialed ballots were properly excluded from the total vote under the application of the doctrine announced in Pennington v. Hare, 60 Minn. 146, 62 N. W.

116, and Truelsen v. Hugo, 81 Minn. 73, 83 N. W. 500. This left only the question of the blank and unintelligible ballots, and the court held that a bare attempt to vote by depositing a blank ballot or an unintelligible ballot was not effective and should not be included in the total count upon which the required four-sevenths was to be calculated. We find no conflict between the Hopkins case, 81 Minn. 189, 83 N. W. 536, and the Hugo case, 84 Minn. 81, 86 N. W. 784. In the latter, two proposed amendments to the charter of Duluth were submitted to the voters at the general city election occurring in February, 1901. Each of the proposed amendments received more than three-fifths of the votes cast on the amendment but less than three-fifths of the total votes cast at the election. There was no question of blank or unintelligible ballots involved. This court there held, following the county seat removal cases and the cases involving the gross earnings tax statutes, that it was necessary to have three-fifths of all the electors voting at the election. This was a city election, and the submission of the charter amendments was not viewed as a separate special election, as we think it must be in the case at bar on account of the present reading of § 1284. It is significant that that section refers to "both elections" only when the proposed charter or its amendments are submitted at an election held at the same time with a general election.

In Eikmeier v. Steffen, 131 Minn. 287, 155 N. W. 92, 94, this court had before it a contest on the result in Pipestone county of an election held under the county option law. Mr. Commissioner Taylor, speaking for a majority of this court, reviewed our decisions under the county seat removal law and numerous local option elections. It was there held, following McLaughlin v. Village of Rush City, 122 Minn. 428, 142 N. W. 713, that under the county option law unintelligible ballots should be counted in arriving at the total vote cast at the election. Whether the rule should be limited so as to include ballots totally blank was left for consideration when that question should be directly involved. In the Eikmeier case [131 Minn. 289] the statute under consideration required "a majority of the votes" cast at such election, whereas the statute which we

have under consideration requires "three-fifths of the qualified voters * * * voting at the next election and not otherwise." There may be little distinction between the language under consideration in the Eikmeier case and that now before us; but in Lodoen v. City of Warren, 118 Minn. 371, 136 N. W. 1031, this court found no conflict between the Hopkins case, 81 Minn. 189, 83 N. W. 536, and the local option cases. We cannot regard as a vote a blank ballot expressing no intention one way or another upon the question presented. Possibly it is a ballot cast, but certainly it is not a vote any more than the ballot of a voter who enters a booth with the intention of voting at a general election and then concludes that he does not desire to vote and returns his ballot to the election officers. Certainly a voter cannot be said to have voted when he casts only a ballot blank on every proposition submitted to him. We follow the Hopkins case in holding that the blank ballots should be excluded from the computation of the total votes cast at the special election. Consequently the amendment to the charter was accepted by more than three-fifths of the voters voting at that election. As we compute the votes, it is not necessary to pass upon the question of the unintelligible ballots under the statute here controlling.

The order of the trial court is affirmed.

*OLSEN, Justice* (dissenting).

It seems to me that art. 4, § 36, of the constitution controls, and that no statute can change or qualify the provisions thereof. It provides, as to the original charter:

"Such charter shall be submitted to the qualified voters of such city or village at the next election thereafter, and if four-sevenths of the qualified voters voting at such election shall ratify the same it shall, at the end of thirty days thereafter, become the charter of such city or village as a city."

As to amendments of the charter, the provision is that amendments submitted must be "accepted by three-fifths of the qualified voters of such city or village voting at the next election and not otherwise."

The amendment here in question was submitted to the voters of the city at the general election on November 8, 1932. It was so stated. There was no suggestion of any special election. There was but one election, held at designated places, during the hours fixed by law for a general election and conducted by one set of election officials.

A charter or an amendment thereto may be submitted at a general election or at a special election called for that purpose. A special election for such purpose is only necessary when the charter or amendment is to be submitted at a time when a general election is not available or not to be held within the time at which it is required or desired to submit the matter. Here the city council, by motion, decided to submit the amendment at the general election. No special election was called or contemplated. Notice was given that the proposed amendment would be submitted to the voters at the general election, and it was so submitted. No special election could be held without first being called and fixed by the city council. The general election was the "next election" specified in the constitutional provision. The charter amendment was not "accepted by three-fifths of the qualified voters of such city. or village voting at the next election."

The opinion presented would change the provisions of art. 4, § 36, of the constitution so as to require only three-fifths of the voters voting .on the proposed charter amendment, instead of requiring three-fifths of the qualified voters voting at the election, in order to adopt the amendment.

At a general election such as that of November, 1932, presidential electors, state officers, county officers, constitutional amendments, and in many instances city officers, are to be voted upon. Many separate ballots are presented. Intensive campaigns have been carried on. Other issues overshadow the question of a charter amendment and distract the attention of the voters. Many voters will and do disregard and fail to vote on the charter amendment. If only 50 voters had voted on this charter amendment and 30 of them had voted "Yes," the amendment would have been adopted under the rule stated in the opinion. Herein rests the danger of depart-

ing from the constitutional provision and adopting the rules stated in the opinion.

*DIBELL* and *STONE, Justices* (dissenting).

We concur in the dissent of Mr. Justice Olsen.