STATE EX REL. HOWIE, DISTRICT ATTORNEY, v. BRANTLEY, STATE GAME AND FISH COMMISSIONER.

[74 South. 662, In Banc.]

1. CONSTITUTIONAL LAW. *Constitutional amendment. Electors voting.*

Under Const. 1890, section 273, providing that if it shall appear that a majority of the qualified electors voting shall have voted for the proposed change, alteration, or amendment, that it shall be inserted by the next succeeding legislature as a part of this Constitution, and not otherwise, amended returns of an election upon a constitutional amendment, showing the number of electors appearing at the polls and voting legally or otherwise, which may or may not have been counted in ascertaining the result of the election, are of no value, since they do not show the number of qualified electors voting, for the reason that, though a qualified voter succeeds in getting his name on the poll list, and a ballot in the box, he is not a voter voting unless his ballot is such as is prescribed by law, and conforms to the general law regulating elections.

2. CONSTITUTIONAL LAW. *Constitutional amendments. Majority vote. How determined. Presumptions.*

In the absence of a correct certification of the number of electors voting upon a constitutional amendment submitted at a general election, the court must presume that the highest number of

votes cast for candidates for any one office represented the number of votes cast at the election, so that a vote for the amendment to the Constitution providing for the initative and referendum was adopted when the vote therefor was 19,118 and the highest vote cast for any office at that election was 37,583.

3. COURTS. *Stare decisis.*

It is the duty of the court to adhere to a former ruling on a constitutional question, not only for the reason that an interpretation once put upon a Constitution should thereafter be adhered to, unless manifestly wrong and mischievous in effect, but for the further reason that it is one of the fundamental canons of construction, that Constitutions should receive a liberal interpretation to the end that the will of the people as therein expressed may have full and complete operation.

4. CONSTITUTIONAL LAW. *Constitutional amendment. Separate objects.*

The mere fact that the separate powers of initiative and referendum might have been submitted upon separate ballots is not determinative of the question whether submission of both projects on one ballot violated Constitution 1890, section 273, as to plurality of objects.

5. SAME.

The three propositions contained in the constitutional amendment providing for the initiative and referendum are but parts of one general plan or scheme looking to a more direct control of legislation (or of the laws, both constitutional and statutory, by which they are to be governed) by the people. This purpose can be partially accomplished by the adoption of any one of the three propositions, but can be accomplished in full only by the adoption of all of them.

6. CONSTITUTIONAL LAW. *Statute. Construction. Laws.*

A statute and Constitution though of unequal dignity, are both "laws," and each rests upon the will of the people.

7. STATUTE. *Constitutional amendments. Powers of people.*

Since by the bill of rights all political power is vested in the people and by Constitution 1890, section 33, as amended, a part of the legislative power is conferred upon the legislature. The remainder being reserved to the people and by constitution 1890, section 273, the legislature has a limited power to amend the Constitution, Laws 1916, chapter 159, as to initiative and referendum gives no new power to the people and is valid.

APPEAL from the circuit court of Hinds county.

HON. W. H. POTTER, Judge.

Two cases, one *quo warranto* by the state, on the relation of J. H. Howie, district attorney, against Z.

A. Brantley, game and fish commissioner of the state and the other arising from *habeas corpus* by Sim Robinson after conviction of hunting without a license. In the first case the writ prayed for was issued, but judgment entered in favor of Brantley and the relator appeals, and in the second case the petition for writ of *habeas corpus* was denied and the relator appeals.

The facts are fully stated in the opinion of the court.

In Case 19461. *Lamar Easterling,* Asst. Atty. Gen. for Appellant. *I. B. Harris,* Atty. for Appellee.

In Case 19464. *J. M. Vardaman,* Atty. for Relator. *Ross A. Collins,* Atty. Gen. Opposed.

PER CURIAM.

These cases were argued and submitted together, and present the same legal questions. The first cause, No. 19461, is an appeal from a judgment in *quo warranto* on the information of the district attorney against appellee, Z. A. Brantley, game and fish commissioner of the state. The petition for the writ averred that appellee was unlawfully holding and exercising the functions of a public office, was claiming the right to an office in the state capitol, and was demanding hunters' licenses and threatening to impose fines upon persons violating chapter 99, Laws 1916, known as the "Game and Fish Law."

In the second cause, No. 19464, Sim Robinson was convicted before the police justice of the city of Jackson for hunting without the license required by said game and fish law. After conviction, he sued out a writ of *habeas corpus* before the circuit court of the first district of Hinds county. The writ was denied, and Robinson appeals from the judgment, so denying relief by *habeas corpus.*

The real issue presented by the appeal in the first case, the one vital question for decision, is whether Mr. Brantley legally holds and occupies the public office of state game and fish commissioner. The controlling ques-

tion in the *habeas corpus* case is whether appellant Robinson was convicted of crime without authority of law. The determination of the main question in each case must be controlled by the further question whether the new game and fish statute above mentioned is constitutional, and therefore is a valid, subsisting law, and whether the law, if constitutional, is now in force and effect. If there is no such law now in force and effect then it follows that there is no public office of state game and fish commissioner, and, furthermore, no one could be convicted for violating any of the provisions of such law.

The argument of these cases is directed to two general legal propositions. The first general proposition turns upon the question, Is chapter 99, Laws 1916, as drafted and prepared by the legislature, unconstiutional and void on its face? The second general contention is that the statute in question if a valid law, has been repealed or nullified by a vote of the people, acting under the so called initiative and referendum amendment to the Constitution. The discussion of each of these two general propositions has necessarily directed the attention of counsel and court to many specific points of attack on the law in question.

There are several reasons advanced why chapter 99, Laws of 1916, contravenes our state Constitution, and, accordingly why the said law should be regarded as unconstitutional and void on its face. It is suggested that the statute violates sections 20 and 175 of the state Constitution. These sections of our Constitution provide that no person shall be elected or appointed to office in this state for life or during good behavior, but the term of all offices shall be for some specified period, and that officers shall be liable to indictment for willful neglect of duty or misdemeanor in office, and upon conviction shall be removed from office. It is contended that the county wardens and deputies provided for by the game and fish law are public officers, and that

section 14 of the act authorizes their appointment and removal by the state game and fish commissioner, and that the authority to remove may be exercised by the state game and fish commissioner at any time, contrary to the provisions of the Constitution. It is further contended that the statute violates section 261 of the Constitution, which reads as follows:

"The expenses of criminal prosecutions, except those before justices of the peace, shall be borne by the county in which such prosecutions shall be begun; and all net fines and forfeitures shall be paid into the treasury of such county. Defendants, in cases of conviction, may be taxed with the costs."

Reference to section 17 of the act will show that each county warden is to receive one-half of all fines, forfeitures, and penalties collected in the county in which he holds office, for violations of the game law, and the remaining one-half is to be forwarded on the first day of each month to the state treasurer to be credited to the game and fish protection fund provided for by the statute. It is contended that the scheme provided by this new game and fish law, whereby the net fines and forfeitures are to be sent to the state capitol and paid into the state treasury to the credit of the game and fish protection fund, manifestly violates the plain provisions of section 261 of the Constitution.

Section 18 of the statute provides for a county license of two dollars for each resident hunter, a state license of five dollars for each resident hunter, and a license of fifteen dollars for each nonresident hunter. By section 20 of the act nonresidents are prohibited from trapping in the state of Mississippi. It is contended that section 23 permits resident owners to hunt on their own premises, without license, and denies to nonresident hunters the right to hunt upon their own land without first paying for and obtaining a license. From these provisions it is suggested that the law unlawfully discriminates against nonresidents, in that it denies them the right

to trap upon their own plantations or lands, and denies them the privilege of hunting upon their own lands without first obtaining a license; that every one has a qualified interest in the game found upon his own lands, and has a natural right to hunt, trap, and fish thereon, and that this right inheres in him by reason of his ownership of the soil.

It is further contended that, under section 18 of the game law, all minor members of families may hunt under the one license issued to the head of the family, and that, accordingly this unlawfully discriminates against certain other hunters. It is suggested that a large portion of the hunting and fishing is done by young men or boys under the age of twenty-one years, who, under the provisions of this act, would not be required to pay a license if they are living under the parental roof; that the amount of game which every hunter is authorized to take is limited; that under this plan a father with many sons could take a much larger portion of game and fish than many other heads of families; that the orphan boy in many instances could not avail himself of the provision of hunting under a license issued to the head of a family, but, on the contrary, would be required to pay the license. From all this it is contended that, although the fish and game equitably belongs to all the people of the state, under the requirements of this new statute there is unlawful discrimination against certain classes of citizens of our own commonwealth.

The further question presents itself, that is, if the statute under attack attempts unlawfully to divert the fines and forfeitures from the various counties and deposit them in the state treasury to the credit of the game protection fund, contrary to the state Constitution, and if the licenses provided for work an unlawful discrimination against certain classes of citizens, that then no adequate revenue is provided for maintaining the office of state game and fish commissioner, for paying the extra expenses of county wardens, and for en-

forcing the provisions of the statute; and, if this be the true situation, then the act does not provide a workable plan and harmonious scheme for protecting the game and fish of Mississippi, and that accordingly, the whole act should be declared unconstitutional and void. It is suggested that the legislature would not have enacted this law without the means for paying the officers charged with the duty of enforcing it; that the legislature would not have enacted it with the other objectionable features indicated; that the law is so deficient in many important particulars that the whole act should be struck down as inoperative and void.

Many reasons are also assigned why chapter 99, Laws of 1916, has not been nullified by a referendum vote of the people. On this branch of the discussion, several reasons are assigned why the referendum amendment to the Constitution has not been legally adopted and in serted as a part of our organic law. Briefly stated, the contentions are that the initiative and referendum amendment to the Constitution is void on its face, because the amendment, purporting to be only one amendment, in fact embraces two separate and distinct powers and amendments to the state Constitution, to wit the power of the people themselves to make or nullify a statutory law; and, second, the power of the people to initiate a constitutional amendment. It is furthermore claimed that this amendment did not receive a majority of the qualified electors voting at the general election at which the people undertook to adopt or approve the initiative amendment, contrary to the provisions of section 273 of our state Constitution, requiring every amendment to our organic law to receive "a majority of the qualified electors voting" at the election.

The members of this court have given to the many delicate and constitutional questions presented by these records the most careful thought and consideration. After mature deliberation, a majority of the court are convinced beyond doubt that the judgment of the learn-

ed circuit court is erroneous, and should be reversed. The several members of the court are not agreed, however, upon any one reason that should be assigned why the judgment of the lower court should be reversed. Some of the justices are of the opinion that the game and fish statute is unconstitutional on its face, and therefore inoperative and void; and they reach this conclusion regardless of the initiative and referendum amendment to the Constitution and the vote of the people thereunder. Other members of the court are of the opinion that the statute in question has been legally voted out by the people, and therefore is no longer in force and effect. Inasmuch as a majority of the court are not agreed upon any one of the many constitutional points argued and considered, and therefore no legal principal can be conclusively settled at this time, we shall forego or waive any elaborate discussion of the merits or demerits of any one of the many contentions made or constitutional questions argued. As stated by the Wisconsin court, through Marshall, J.:

"A situation so extraordinary rarely occurs in judicial work. That it should move judicial minds to exhaust all reasonable efforts for harmony, as it has in this case, is most natural." Will of McNaughton; *Frane* v. *Plumb,* 138 Wis. 179, 118 N. W. 997, 120 N. W. 288.

The majority of the court are agreed that chapter 99, Laws of 1916, should not now be regarded in force and effect in Mississippi; and from this it necessarily follows that there is no such public office now as that of state game and fish commissioner. It is the judgment of the court, therefore, that the writ of *quo warranto* was properly issued; that the demurrer filed by the district attorney to the special plea in bar of the defendant was improperly sustained; that the judgment entered in favor of Mr. Brantley was erroneous, and that this judgment should be set aside and vacated and a judgment entered here, declaring that no such office as state

game and fish commissioner now exists, and that appellee should be ousted of and restrained from exercising the functions of any such office. We are also of the opinion that the judgment of the learned circuit court, denying the petition of *habeas corpus* to Sim Robinson, should be set aside, and, there being no dispute as to the facts, that judgment should be entered here in favor of Sim Robinson, relieving him from the conviction mentioned, and discharging him from custody. So ordered. *Affirmed.*

Sykes, J., dissents.

## On Suggestion of Error.

Smith, C. J. Appellee was duly appointed, and qualified, as fish and game warden under chapter 99, Laws 1916, and entered upon the discharge of his duties as such. Afterwards the statute was referred to the people for ratification or rejection, under the provisions of the initiative and referendum amendment to the Constitution (chapter 159, Laws 1916), and there was a majority vote against it. Some time thereafter this proceeding was instituted in the court below to test the right of appellee to continue to hold and discharge the duties of the office, and this appeal is from a judgment in his favor.

On a former day of this term, the judgment of the court below was reversed, and judgment final was entered here in favor of appellant. A majority of us concurred in the result reached, but were divided upon the various questions presented for determination. Sec. 74 So. —. The cause now comes on again to be heard upon the motion of appellee to correct this judgment, on the ground that no question presented to us by the record has been decided against him by a majority of the judges, from which it necessarily follows that the judgment of the court below should be affirmed, and also upon a suggestion of error, pointed at the conclusion arrived

at by some of the judges, that the fish and game law is void, for the reason that it violates several sections of the Constitution. Upon consideration of the motion and suggestion of error, a majority of us have arrived at a conclusion that will enable us to dispose of the case without reference to either question of practice presented by the motion, or the constitutionality of the statute presented by the suggestion of error.

Appellee's main contention on the merits is that the referendum election was a nullity, for the reason that the initiative and referendum amendment is invalid on two grounds, the first of which is that it failed to receive a majority of the votes cast at the election at which it was submitted to the people for ratification or rejection. The provision of section 273 of the Constitution, with reference to the votes necessary for the adoption of a constitutional amendment, is as follows:

"If it shall appear that a majority of the qualified electors voting shall have voted for the proposed change, alteration, or amendment, then it shall be inserted by the next succeeding legislature as a part of this Constitution, and not otherwise."

The evidence upon which this claim of appellee is based, as it appears from his plea, admitted to be true by the demurrer, and from the agreement of counsel, is that the original election returns transmitted to the secretary of state by the election commissioners of the various counties disclose that nineteen thousand one hundred and eighteen votes were cast in favor of the amendment, eight thousand seven hundred and eighteen against it, and that the highest vote cast for any officer voted for at the election was thirty-seven thousand five hundred and eighty-three, but do not disclose the total number of votes cast at the election, unless all of the voters voted for the officer receiving the highest number of votes. After the receipt of these returns, the secretary of state wrote a circular letter to the election commissioners of each county, requesting them to recon-

vene and ascertain and certify to him the total number of votes cast in each county, with which request the election commissioners of all but six counties complied by certifying to the secretary of state, not the number of votes counted by them in ascertaining the result of the election, but the number of qualified electors who deposited ballots in the ballot boxes as appeared from the list thereof made by the clerk of the election as each ballot was deposited. The number of such qualified electors was forty thousand and seventy. If the amended returns are to govern, the amendment was rejected; and if they are not, it was ratified.

Leaving out of view appellant's contention that these election commissioners were without authority under the statute to reconvene and amend the election returns transmitted by them to the secretary of state, and were also without authority at any time to declare and certify to the secretary of state the total number of votes cast at the election, and assuming, for the sake of the argument, that the amended returns transmitted to the secretary of state are official records of his office, so that we may take judicial notice thereof—for it is only evidence of which we can take judicial notice that can be considered in determining questions of this character—the amended returns are of no value here; for they show, not the number of "qualified electors voting," but simply the number thereof who appeared at the polls and deposited ballots, legal or otherwise, in the ballot boxes, which ballots may or may not have been counted by the managers or commissioners in ascertaining the result of the election. "Though a qualified voter succeeds in getting his name on the poll list and a ballot in the box, he is not a voter voting unless his ballot is such as is prescribed by law and conforms to the general law regulating elections." 9 R. C. L. 1122; *State* v. *Clark*, 59 Neb. 709, 82 N. W. 8; *State* v. *Clausen*, 72 Wash. 409, 130 Pac. 479, 45 L. R. A. (N. S.) 714. As shown in the note to *State* v. *Clausen, supra,*

all of the authorities hold that some rejected ballots should be excluded in ascertaining the result of. this kind of an election; the only conflict among them being as to the character of rejected ballots which should be excluded. That ballots are frequently rejected by the managers and commissioners of elections, so that they never become in fact votes, is a matter of common knowledge. The discrepancy, therefore, for aught that appears to the contrary, between the number of ballots deposited in the ballot boxes and the highest number of votes cast for any officer, may be caused by the fact that some ballots were rejected by the managers or commissioners. Consequently as was done in *State* v. *Jones,* 106 Miss. 522, 64 So. 241 (and, for that matter, as has heretofore been done each time an amendment has been inserted in the Constitution), we must presume that the highest number of votes cast for any officer represents the total number of votes cast at the election, from which it follows that we must hold that the amendment received the required number of votes.

This brings us to the second objection urged by counsel for appellee to the amendment, which is that it contains more than one proposition, and therefore violates the requirement of section 273 of the Constitution that:

"If more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for or against each amendment separately."

The ground of this objection is that the amendment reserves to the people three separate and distinct powers, each of which could have been the subject of a separate amendment: First, power to adopt a statute upon their own initiative; second, power to annul a statute enacted by the legislature; and, third, power to amend the Constitution upon their own initiative.

The solution of this question will be largely determined by whether we adhere to the liberal and common sense interpretation put upon section 273 of the Consti-

tution, in *State* v. *Jones,* 106 Miss. 522, 64 So. 241; or whether we return to the strict and narrow interpretation put thereon in *State* v. *Powell,* 77 Miss. 543, 27 So. 927, 48 L. R. A. 652. That it is our duty to adhere to the ruling in the former case we entertain no doubt; not only for the reason that an interpretation once put upon a Constitution should be thereafter adhered to, unless manifestly wrong and mischievous in effect, but for the further reason that it is one of the fundamental canons of construction that Constitutions should receive a liberal interpretation, to the end that the will of the people as therein expressed may have full and complete operation. It is true that there was a dissenting opinion in that case; but the writer thereof, who concurs herein, expressly declined to pass upon the question here presented, for the reason that, in his judgment, first, a decision thereof was not necessary for a disposition of the case; second, the amendment was not passed by the legislature; and, third, the case was controlled by *State* v. *Powell,* 77 Miss. 543, 27 So. 927, 48 L. R. A. 652, which case, under the *stare decisis* maxim, should be adhered to and not overruled.

It is undoubtedly true that each of the propositions contained in the amendment here under consideration could have been embodied in separate amendments, and that the failure to adopt one of them would have in no wise interfered with the operation of the other or others; but this fact alone cannot be made determinative of the question, as was pointed out in *State* v. *Jones, supra.* If this fact alone is determinative, the Jones Case would have been decided the reverse of what it was; for the amendment there under consideration contained two separate and distinct propositions: First, the change from the appointment to the election of circuit judges; and, second, the change from the appointment to the election of chancellors—either of which could have been adopted and put into operation without reference to the other, and one of which might have been desirable in the opinion of some of the voters and the other not.

What caused that amendment to be single, instead of double, was the unity in its ultimate end; to wit, the change from the appointment to the election of the judges of the courts of original jurisdiction; for "the unity of object is to be looked for in the ultimate end, and not in the detail or steps leading to the end." *Lobaugh* v. *Cook,* 127 Iowa, 181, 102 N. W. 1121. "If, in the light of common sense, the propositions have to do with different subjects, if they are so essentially unrelated that their association is artificial; they are not one; but if they may be logically viewed as parts or aspects of a single plan, then the constitutional requirement is met in their submission as one amendment." *State* v. *Anderson,* 49 Mont. 387, 142 Pac. 210, Ann. Cas. 1916B, 39.

Returning, now, to the amendment under consideration, it seems clear from an inspection thereof that the three propositions contained in it are, in the language of the supreme court of California, in *Ex parte Pfahler,* 150 Cal. 71, 88 Pac. 270, 11 L. R. A. (N. S.) 1092, 11 Ann. Cas. 911, but "parts of one general plan or scheme looking to a more direct control of . . . legislation" (or of the laws, both constitutional and statutory, by which they are to be governed) "by the people." This purpose can be partially accomplished by the adoption of any one of the three propositions, but can be accomplished in full only by the adoption of all of them.

The supreme courts of Montana, in *State* v. *Anderson, supra,* and Washington, in *Gottstein* v. *Lister,* 88 Wash. 462, 153 Pac. 595, have each demonstrated that an initiative and referendum amendment contains but one proposition, within the meaning of a constitutional provision similar to ours. If further reasons be desired for so holding, they may be found in the opinions rendered in those cases. That the purpose of two of these propositions is to insure control by the people over statutes, and of the other to insure their control over the Constitution, is immaterial; for a statute and a Con-

stitution, though of unequal dignity, are both "laws," and each rests upon the will of the people.

There is another aspect in which this question may be viewed, which is not without value in this connection, and that is, as declared by our Bill of Rights, that "all political power is vested in and derived from the people," and they have the right to confer as much or as little thereof on the various departments of our government as they may desire. By section 33 of the Constitution, as originally adopted, all legislative power was conferred on the legislature. By the section as amended, only a part of this power is conferred upon the legislature, the remainder thereof being reserved to the people. So no new power was conferred by the amendment, either upon the legislature or the people. This is especially true with reference to the power to make or amend the Constitution, for that power had never been delegated to the legislature, except to the limited extent provided by section 273 of the Constitution, which section remains intact, being in no way affected by the amendment here under consideration.

Much has been said in the argument of this cause, and of others, in which this question was presented, but not decided, about the evil results which may follow the adoption of this amendment—one of which may be the reopening of questions supposed to have been put at rest by the adoption of our present Constitution. This result may, or may not, follow, but with it we have here no concern; for that question was for the determination of the legislature which submitted the amendment, and of the people who adopted it. Our duty is to uphold the amendment, unless it appears to us beyond reasonable doube to be invalid.

We conclude, therefore, that the initiative and referendum amendment was properly inserted in the Constitution, from which it necessarily follows that the statute here in question was annulled by the referendum vote thereon. This being true, the judgment formerly en-

tered by us is correct, without reference to the merits of the matters submitted by the motion and suggestion of error, both of which will be overruled, without any expression of opinion by us relative thereto.

Motion to correct judgment and suggestion error overruled.                                    *Overruled.*

COOK, J. (specially concurring). I approve the opinion written by the Chief Justice in this case. If the Jones Case is not overruled, every question raised in this case was settled by the Jones Case, except the suggestion that the record shows the amendment did not receive the vote of the majority of the voters voting at the election. I have given to this point my most careful consideration, and am unable to satisfy myself that it is supported by the record.

This question was undoubtedly considered by the legislature, and the legislature necessarily found that the amendment received the constitutional majority. It is regrettable that there is even a suspicion that the amendment was counted in. There was a time when "counting out" was tolerated, if not approved; but the present Constitution devised a scheme by which civilization could be saved in this state without resorting to force or strategy. From my viewpoint, fraud, actual or imputed, must be clearly established to justify the conclusion that the amendment was counted in.

The writer dissented in the Jones Case, and indulged in some criticisms of the court's opinion; but my main reason for dissent was placed on the doctrine of *stare decisis*. I thought then that the court should have followed the Powell Case, but the majority declined to do so. This court, in the Jones Case, adopted the most liberal rule of construction to uphold amendments to the Constitution written into the Constitution by the legislature. So, for the same reasons prompting me to dissent in the Jones Case, I am now concurring in this case. Again I say:

113 Miss.—51

"If the law, well established, may be annulled by an opinion, a foundation is laid for the most restless instability. The decisions of one court may be overruled by another court, and those of the latter will have only a transient efficacy, until some future court, dissatisfied with them, shall substitute new principles in their place. No system of inflexible adherence to established law can be as pernicious as such ceaseless and interminable fluctuations."

SYKES, J. (dissenting). I am again called upon to dissent from the opinion of the majority of the court upon the question of the constitutionality of this amendment commonly referred to as the initiative and referendum amendment. My views upon this question were briefly summarized in a dissenting opinion in the case of *Joseph W. Power, Secretary of State,* v. *W. T. Ratliff et al.,* 72 So. 864. The several oral arguments and printed briefs in the instant case have but strengthened my convictions as to the soundness of my dissent in the former case.

The opinion of the majority of the court in the present case is based upon the opinion in *State* v. *Jones,* reported in 106 Miss. 522, 64 So. 241. I agree with the decision in the Jones Case, but I do not agree with all of the reasoning or all of the opinion in that case. However, the entire opinion and the reasoning contained therein may still be sound, yet it does not negative the fact that there were in reality two amendments submitted as one in this case. The point decided in the Jones Case was a very narrow one. Section 153 of the Constitution, before amended, read as follows:

"The judges of the circuit courts and of the chancery courts shall be appointed by the Governor, with the advice and consent of the senate, and shall hold their offices for the term of four years."

As amended (see Laws 1910, chapter 358) it now reads:

"The judges of the circuit and chancery courts shall be elected by the people in a manner and at a time to be provided by the legislature and the judges shall hold their office for a term of four years."

It will be noted that the only change made in this section is from an appointive to an elective scheme. Section 273 of the Constitution provides that:

"If more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for or against each amendment separately."

There was only one section of the Constitution proposed to be amended, viz. section 153. The only amendment therein proposed was the election, instead of appointment, of these *nisi prius* judges. There was but one object and one purpose in view in this amendment, viz. a change from an appointive to an elective system of those *nisi prius* judges mentioned. No other section of the Constitution was expressly or impliedly amended thereby. The Constitution itself treated the judges of these two courts in one section. It regarded them as kindred subjects or kindred matter. While each has a separate or exclusive jurisdiction, in some instances they have concurrent jurisdiction. Their terms of office are the same. It would be an anomaly and there could be no reason for electing one set of these judges and appointing the other. They are so kin, so interrelated, that it would be nonsensical to have the people elect one set of these judges and the Governor appoint the other. The mere fact that the Constitution makers themselves treated them as of one class and under one subject in this section is ample authority for upholding this amendment. On page 560 of 106 Miss., on page 248 of 64 So., in the opinion in the Jones Case the court says:

"The only subject dealt with was a method of selecting the judges of the circuit and chancery courts, and the only change contemplated was that their selection

should thereafter be by election by the people, instead of appointment by the Governor with the advice and consent of the senate. In other words, the whole proposition submitted by the proposed amendment was the substitution of an elective for an appointive judiciary, so far as it applies to the method of selecting the judges of the circuit courts and the chancery courts in this state."

The amendment here in question is unconstitutional and void upon its face, because it submits in one amendment two different amendments relating to separate and distinct subjects and matters, the one independent of the other. The first amendment is the one giving the people the power to initiate and regulate statutory laws. This, in common parlance, is termed the initiative-referendum amendment. Broadly and liberally speaking, this initiative-referendum amendment gives the people the power to control legislation. The only way the initiative and the referendum can stand together as one amendment is by saying that it only gives the people the power to regulate and control their statutory law. The history of these amendments, and the courts which have upheld an amendment containing the initiative and referendum, has been upon the theory that it only had one purpose and object in view, viz. giving the people the right to regulate and control their statutory law. The demand therefor grew out of a distrust of the legislatures. This reason is very well stated in the case of *State ex rel. Hay* v. *Alderson,* 49 Mont. 387, 142 Pac. 210, Ann. Cas. 1916B, 39, cited in the majority opinion in this case. The question before the court was whether or not the power to initiate and refer statutory laws was properly submitted as one amendment. Their constitutional provision relating to separate amendments is similar to section 273 of our Constitution. On page 404 of 49 Mont., on page 212 of 142 Pac. (Ann. Cas. 1916B, 39), is found the following quotation:

" 'Constitutions,' says Judge Story, 'are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss.' . . . If, in the light of common sense, the propositions have to do with different subjects, if they are so essentially unrelated that their association is artificial, they are not one; but if they may be logically viewed as parts or aspects of a single plan, then the constitutional requirement is met in their submisson as one amendment."

In page 406 of 49 Mont., on page 213 of 142 Pac., Ann. Cas. 1916B, 39, in the same case, in a quotation from the case of *State* v. *Timme,* 54 Wis. 318, 11 N. W. 785, the following rule is quoted with approval:

"In order to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other."

Again, on the same page, the opinion goes on:

"Only one provision of the Constitution was changed, to wit, the provision by which the entire legislative authority of the state had been lodged in the legislative assembly."

This would have been true in the instant case, and the amendment would only have applied to section 33 of the Constitution, had it left out the part relating to a constitutional amendment. The material part, however, of the opinion in this case justifying the decision of the court, the *sine qua non,* so to speak, the very essence of it, is

contained on page 408 of 49 Mont., on page 214 of 142 Pac., Ann. Cas. 1916B, 39, as follows:

"After all is said, then, the question is an historical one. Much is made of the fact that the initiative is wholly foreign to our institutions, whereas the referendum has been with us, in one form or another, since early ages; but the referendum established by the amendment in question is the Swiss referendum, and is not the plebiscite resorted to in American practice from the earliest times for the settlement of constitutional or local questions; and while it is a fact that the initiative is the later invention, and does not prevail in all the communities which have the referendum, a very brief glance into political history will disclose that the initiative and the referendum came to us together and at a time when they were considered as essentially complementary. It will readily be recalled that for at least fifteen years prior to 1906 distrust of legislatures as truly representative of popular will was widespread and there was vigorous agitation for a corrective. The press teemed with discussions of the initiative and referendum, always bracketed together, as a supposed panacea; many states adopted them as one, and there cannot be the slightest doubt that to the common understanding of our people they presented the aspect of a single plan to control the power of the legislature through the means of 'direct legislation.' See Oberholtzer on Referendum, chapter 15; Phelps on Initiative and Referendum. By them, as the supreme court of California has said, the people reserved to themselves supervisory control of legislation. *In re Pfahler*, 150 Cal. 71, 76, 77, 88 Pac. 270, 11 L. R. A. (N. S.) 1092, 11 Ann. Cas. 911. They are the positive and negative poles of the same magnet—opposite sides of the same shield."

In a nutshell, the only way to sustain the initiative and referendum of statutory laws as one amendment is on the theory that it only gives the people direct control of legislation, or supervisory control of legislatures.

That is the sole object and purpose of the amendment. To the same effect are the other initiative and referendum cases cited in the majority opinion. As is stated in that part of the opinion quoted by the majority in the case of *Ex parte Pfahler*, 150 Cal. 71, 88 Pac. 270, 11 L. R. A. (N. S.) 1092, 11 Ann. Cas. 911, they are, referring to initiative and referendum amendments, but "part of one general plan or scheme looking to a more direct control of local legislation by the people of the city." The strained construction placed on this amendment by the majority opinion to uphold its constitutionality is very well illustrated in this paragraph of the opinion wherein the court has placed in parentheses the words "(or the laws, both constitutional and statutory, by which they are to be governed)." None of the cases cited in this opinion bears upon the question here presented, and after a careful examination of the authorities I am satisfied that this exact question has not been decided by any court.

The only other case cited in the majority opinion upon this question is that of *Gottstein et al.* v. *Lister, Governor*, 88 Wash. 462, 153 Pac. 595, another initiative-referendum case, involving only statutory laws, and not constitutional amendments. The same authorities cited in that case are cited in the Montana case, the Montana case being there cited also.

The constitutional amendment in question only proposed to amend section 33 of the Constitution, which reads as follows:

"The legislative power of this state shall be vested in the legislature, which shall consist of a senate and a house of representatives."

The amended section, after quoting in full the original section, reads in part as follows:

"But the people reserve to themselves the power to propose legislative measures, laws, resolutions, and amendments to the Constitution, and to enact or reject the same at the polls independent of the legislature."

This amendment, so far as the initiative part is concerned, places a statutory law and an amendment to the Constitution upon exactly the same plane or basis. Section 273 of the Constitution provides the manner in which an amendment to the Constitution may be submitted to the people to be voted on by them, and it then provides that:

"If more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for or against each amendment separately."

The meaning of this section is perfectly plain. Its object and purpose is to give the people an opportunity of voting separately on each separate amendment to the Constitution. It provides the sole and only means by which the Constitution may be amended. Its provisions are mandatory, and must be followed in submitting amendments to the people. This has been expressly held in both the *Powell Case,* 77 Miss. 543, 27 So. 927, 48 L. R. A. 652, and in the Jones Case above referred to. In speaking of this section of the Constitution and of the interpretation to be placed thereon, the opinion of the court in the *Jones Case, supra,* on page 562 of 106 Miss., on page 248 of 64 So., says:

"That the people of the state, acting through the constitutional convention which framed the Constitution, intended to impose and did impose certain limitations upon amendments to that instrument, which must be strictly followed before the same can be amended, we entertain no sort of doubt; but, in determining whether an amendment has been properly submitted after the same has been ratified by the requisite majority of the vote cast, we should examine into the matter of the spirit and according to the rule established by this court in the case of *Green* v. *Weller,* 32 Miss. 664, in which Judge HANDY, speaking for the court, said: 'There is nothing in the nature of the submission which should cause the free exercise of it to be obstructed, or that

could render it dangerous to the stability of the government, because the measure derives all of its vital force from the action of the people at the ballot box, and there can never be danger in submitting, in an established form, to a free people, the proposition whether they will change their fundamental law. The means provided for the exercise of their sovereign right of changing their Constitution should receive such a construction as not to trammel the exercise of the right. Difficulties and embarrassments in its exercise are in derogation of the right of free government, which is inherent in the people.' ''

We agree with the sentiments expressed in that part of the Jones Case and in the quotation from *Green* v. *Weller*. Section 273 of the Constitution, as above said, should be strictly followed, before the Constitution can be amended. The object and purpose of section 273 is, to give to the people at the ballot box the free exercise of their rights to adopt or reject each amendment separately so that the free exercise of their judgment may not be obstructed or hampered by causing them to have to adopt or reject as a whole more than one amendment at a time. Section 273 is mandatory, and must be followed as written. I shall not undertake to go into all of the authorities cited in the opinion in the Jones Case. Suffice it to say that, after a careful examination of all of them, the amendments therein upheld were where the parts thereof were either interdependent the one on the other, or so interrelated that there could be no sort of reason for the adoption of one part and the rejection of the other. I unhesitatingly say that every authority to be found in the books bears out this contention. On the other hand, let us examine the amendment here in question. The majority opinion is based upon the idea that it is one amendment, because it is one general plan or scheme looking to a more direct control of legislation "(or of the laws, both constitutional and statutory, by which they are to be governed."

This opinion admits that they are laws of unequal dignity, and that these amendments could very properly be submitted separately, but nevertheless that, since they are laws, section 273 was not violated, nor, since they are laws, one amendment was sufficient. Before the enactment of this amendment under consideration, as we have above stated, the only way the Constitution could be amended was as provided under section 273 of the Constitution. This being true, it necessarily follows that section 273 of the Constitution is amended with reference to constitutional amendments just to the same extent that section 33 is amended with reference to statutory laws.

In the broadest sense of the term, it is true that a section of the Constitution, or an amendment thereto, is a law. "A Constitution is sometimes defined as the fundamental law of a state, containing principles upon which the government is founded, regulating the divisions of the sovereign powers, and directing to what persons each of these powers is to be confided, and the manner in which it is to be exercised. Perhaps an equally complete and accurate definition would be, that body of rules and maxims in accordance with which the powers of sovereignty are habitually exercised." Cooley on Constitutional Limitations, p. 4. A Constitution, or a section thereof, however, is much more than a mere law; "for the Constitution of the state is higher in authority than any law, direction, or order made by any body or any officer assuming to act under it, since such body or officer must exercise a delegated authority, and one that must necessarily be subservient to the instrument by which the delegation is made. In any case of conflict the fundamental law must govern, and the act in conflict with it must be treated as of no legal validity." Cooley on Constitutional Limitations, pp. 76, 77.

In speaking of our Constitution, Chief Justice WHITFIELD, in his able opinion in the *Powell Case* in 77 Miss.

543, 27 So. 927, 48 L. R. A. 652, has the following to say:

"That law [Constitution] reaches with its protection every one in the state. Unlike an act of the legislature, which may or may not be general, its effectiveness is universal, its potency reaches in its power the territorial limits of the whole state and protects all rights of life, liberty, and property thereunder. This charter of our liberties, this ark of the covenant, the people for seventy-three years had said should not be touched lightly or carelessly changed."

A Constitution is the foundation of the government. The very word "constitution" conveys the idea of stability and permanence. While it may be amended, these amendments are seldom necessary and very generally of doubtful benefit. A Constitution is always the protection of the minority against the majority. It protects all of the people against the passing prejudices, passions, fancies, fads, and follies that from time to time sweep over the country. If these amendments or provisions are to be put upon the same plane with statutory laws then the stability of the Constitution is done away with and lost, and a Constitution becomes merely a name. As is said in Cooley on Constitutional Limitations on page 88:

"A principal share of the benefits expected from written Constitutions would be lost if the rules they established were so flexible as to bend to circumstances or be modified by public opinion. It is with special reference to the varying moods of public opinion, and with a view to putting the fundamentals of government beyond their control, that these instruments are framed; and there can be no such steady and imperceptible change in their rules as inheres in the principles of the common law. Those beneficent maxims of the common law which guard person and property have grown and expanded until they mean vastly more to us than they did to our ancestors, and are more minute, particular, and pervading

in their protections; and we may confidently look forward in the future to still further modifications in the direction of improvement. Public sentiment and action effect such changes, and the courts recognize them; but a court or legislature which should allow a change in public sentiment to influence it in giving to a written Constitution a construction not warranted by the intention of its founders, would be justly chargeable with reckless disregard of official oath and public duty; and if its course could become a precedent, these instruments would be of little avail. The violence of public passion is quite as likely to be in the direction of oppression as in any other; and the necessity for bills of rights in our fundamental laws lies mainly in the danger that the legislature will be influenced, by temporary excitements and passions among the people, to adopt oppressive enactments. What a court is to do, therefore, is to declare the law as written, leaving it to the people themselves to make such changes as new circumstances may require. The meaning of the Constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it."

The question for determination, and which has not been passed upon by any other court in the United States, is whether or not an amendment to our Constitution may provide for the enactment of statutory laws and constitutional amendments in one amendment. It is a cardinal rule of construction, in construing written instruments, that the intent must be gathered if possible from the entire instrument. "It is therefore a very proper rule of construction, that the whole is to be examined with a view to arriving at the true intention of each part." Cooley on Constitutional Limitations, p. 91. The question then presents itself: Did the makers of the Constitution of 1890 treat statutory laws and sections of the Constitution, or amendments to the Constitution, as being generally laws, or as kindred subjects or as being interrelated? The word "law" is used a

number of times in different sections of the Constitution, and whenever used it means either an act passed by the legislature or refers to the common law, which may be changed by the legislature. In no instance does the meaning of the word "law" in the Constitution include a constitutional enactment of any kind, but means a law that may be passed by the legislature. Therefore, with all due deference to my brethren of the majority, I submit that the construction that they here say is liberal is much more than that, that they have out-Heroded Herod in their liberal construction, which here amount to a license. Justice Story, in the quotation above made, says that Constitutions are instruments of a practical nature; that the people must be supposed to read and understand them with the help of common sense. Putting this common sense construction on section 273 of the Constitution, it simply means that amendments relating to different subjects which are independent of each other and which can stand alone, and for which good reasons may be entertained for voting for one and voting against the other, must always be separately submitted to the people to give them a free and untrammelled opportunity to exercise the privilege of amending their Constitution or not as they see fit. The construction placed upon this amendment by the majority opinion is not such a common sense construction. All intelligent laymen recognize a wide difference between a section of the Constitution and a statutory law. The construction of the majority, instead of being a liberal construction is a strained one, as I view it.

"In construing the Constitution, we are to resort to such rules as would aid in the construction of a statute, keeping always in view the fact that while statutes descend into particulars and details, Constitutions deal usually in generalities, and furnish along broad lines the framework of government. In *Daily* v. *Swope,* 47 Miss. 367, it was said: 'The Constitution is a law, differing only from a statute as it is of superior and para-

mount force, irrepealable by the legislature, and which prescribes where it conflicts with a statute. Where the framers of the Constitution employ terms which, in legislative and judicial interpretation, have received a definite meaning and application, which may be more restricted or general than where employed in other relations, it is a safe rule to give to them that signification sanctioned by the legislative and judicial use.' To find the true meaning of the language of the Constitution, we are to look to the existing body of the law, whether common or statutory (Endlich on Inter. Stat. section 520), to former Constitutions (*Allegheny* v. *Gibson,* 90 Pa. 397 [35 Am. Rep. 670]), to existing evils, to the objects and purposes to be accomplished, and to the remedies intended to be provided (Cooley on Const. Lim. 70; *People* v. *Chatauqua,* 43 N. Y. [10]; Endlich on Inter. Stat. section 518).''

The object and purpose to control legislation was completely accomplished by the initiative-referendum of statutory laws in this amendment. Entirely separated and altogether independent of that purpose, and in no way connected with the control of statutory laws, was the second amendment, viz. giving the people by direct vote the right to pass a constitutional amendment. Many good reasons might be given for wanting the control of statutory laws, and at the same time the very people desiring this direct control of these laws could give excellent reasons why they did not want a constitutional amendment placed upon the same plane or parity with a statutory law. They could give many good reasons why they wanted to maintain the permanency and stability of the Constitution and why the present way of amending the Constitution should in no way be altered or changed. The right to control statutory law is one subject, absolutely disconnected and independent of the right to pass constitutional amendments.

The majority opinion, in concluding, in substance says that, since ''all political power is vested in and derived

from the people,'' that no new power was conferred by
the amendment either upon the legislature or upon the
people.    That this is especially true with reference to
section 273 of the Constitution, which is in no way af-
fected by the amendment under consideration.    Section
33 provided the only way that a statutory law could be
passed.    Section 273 provided the only way the Con-
stitution could be amended.    Under the present amend-
ment section 33 is amended by giving back to the people
the power to initiate statutory laws.    Section 273 of the
Constitution is amended by providing an additional way
in which the Constitution may be amended, viz. by initia-
tion and direct vote of the people.    By the Bill of
Rights, Sections 5 and 6 of the Constitution, the poli-
tical power is vested in and derived from the people and
the people have the inherent right to regulate the gov-
ernment, etc.    The power to pass statutory laws was by
them delegated to the legislature under section 33 of the
Constitution and the exclusive manner in which the Con-
stitution could be amended was set forth in section 273.
This amendment amends both of these sections and pro-
vides additional ways in each instance.    If the amend-
ment in question embodied, in addition to the features
already therein, the further question that none but red-
headed and cross-eyed men could hold office in the state
of Mississippi, the liberal construction of the Constitu-
tion of the majority of the court would hold this amend-
ment constitutional because it related only to one sub-
ject, viz. the political power reserved in the people
mentioned in sections 5 and 6 of the Bill of Rights.    If
a municipal corporation should pass an ordinance pro-
viding that animals should not be allowed to go at large
in the municipality, under the reasoning of the majority
of this court, man could not then go at large within the
city because, under this liberal construction, man is an
animal.

In conclusion I wish to say that, in my opinion, while
the authorities cited in the majority opinion and cited in

the Jones Case are authorities sustaining the contention that in this case a double amendment was submitted as one and for that reason that it is unconstitutional, at the same time I think it unnecessary to go out of the state for authorities to sustain the unconstitutionality of this amendment. The public policy of Mississippi, the reasons for the enactment of the Constitution of 1890, are totally different and distinct from those of the Western States, whose authorities have been cited in these opinions. The reasons that existed then exist now. It is true they are dormant but that is all. These reasons made it imperative that the Constitution should be as nearly permanent as a state Constitution may be. They made it necessary that this Constitution should be made difficult to amend. They made it necessary that section 273 should be strictly complied with before an amendment could become a part of it. Being conversant with this public policy and these reasons, I wish to repeat that I am satisfied beyond all reasonable doubt that this amendment is unconstitutional, and, in my opinion, the majority of my brethern have committed a most grave error in this case.

I express no opinion upon the other questions presented.

HOLDEN, J. (dissenting). The importance of this case prompts me to state the reasons upon which I base my dissent from the opinion of the majority.

1. The initiative and referendum amendment is void, because a majority of the qualified electors voting at the election did not vote for it. Section 273 of the Constitution reads in part as follows:

"If it shall appear that a majority of the qualified electors voting shall have voted for the proposed change, alteration, or amendment, then it shall be inserted by the next succeding legislature as a part of this Constitution, and not otherwise."

This section of the Constitution is mandatory, and provides that no amendment shall be inserted by the

legislature as a part of the Constitution unless it shall appear that a majority of the qualified electors voting shall have voted for the amendment. The authorities hold, and it is conceded here by all parties, that a majority of the electors voting means a majority voting at that election, and that whether an amendment to the Constitution has been adopted by the required majority of voters and properly inserted in the Constitution by the legislature is a question for judicial determination, and that the courts may look to the official returns filed in the office of the secretary of state, and from these returns may take judicial notice of the result of the election as shown thereby. *State* v. *Powell*, 77 Miss. 543, 27 So. 927, 48 L. R. A. 652; *Gottstein* v. *Lister*, 88 Wash. 462, 153 Pac. 595.

In the case before us two sets of returns were filed with the secretary of state by the election commissioners. The first set was incomplete, and did not purport to show the total number of voters cast at the election, but merely showed the highest vote cast for any candidate voted for at the election, which showing could not reveal definitely the total number of voters voting at the election, because the highest vote cast for any candidate or measure is always less than the total vote cast at the election for all the candidates or measures where there are several candidates and measures on the ballot. It is a well-known fact that a considerable percentage of the voters do not vote for each and all of the men or measures on the ballot; and so it appears here that the highest vote cast for any candidate, according to the first returns, was about an average of thirty-one votes less in each of the eighty counties than the total number of votes cast at the election in each county, as shown by the amended returns.

When the incompleteness and incorrectness of the first returns appeared to the secretary of state, he, realizing the necessity of an ascertainment of the total number of votes cast at the election, so that it might be correctly

determined whether or not the proposed amendment had received a majority of the votes cast, requested of, and obtained from, the commissioners of election in all the counties amended and complete returns, certifying and showing the total number of votes cast at the election, as shown by the voting lists that were kept by the election officials, and which recorded the names of the voters and the ballots as they were deposited in the ballot box. See Report of Secretary of State, November, 1915, pp. 76, 77; *State* v. *Pigott,* 97 Miss. 599, 54 So. 257, Ann. Cas. 1912C, 1254; *State* v. *Powell,* 77 Miss. 543, 27 So. 927, 48 L. R. A. 652. These complete, certified, unquestioned, and undisputed returns were filed with the secretary of state within ten days after the election, as required by law, and were duly submitted to the legislature. These returns show that forty thousand and seventy qualified electors voted at the election, and that nineteen thousand one hundred and eighteen electors voted for the initiative and referendum amendment, which number is less than a majority of the total votes cast at the election. Therefore, it appearing that the amendment did not receive ''a majority of the votes of the qualified electors voting'' at the election, it could not be validly inserted by the legislature as a part of the Constitution. The correctness, regularity, and legality of the amended returns certifying the total number of voters voting at the election is not contested or disputed, except by argument based upon speculation and mere conjecture. In fact, these returns are the only returns that attempt or purport to show the total number of votes cast, and they being the best evidence, and in fact the only positive and conclusive evidence, as to the material question of the total number of voters voting, they must govern and settle the question, and establish the truth to be that forty thousand and seventy votes were cast at the election; and, this being true, the amendment failed.

In the *Jones Case,* 106 Miss. 522, 64 So. 241, the court acted upon returns there which did not purport to show the total number of votes cast, but it acted upon the presumption that the total number of votes shown to have been cast for the candidate receiving the highest vote was the total number of votes cast at the election. This is an unsatisfactory standard, but the court had no other in that case. But in the case before us now we have the complete and correct returns which show definitely and positively the total number of votes cast, according to the records kept by the officials holding the election.

The effort of the majority opinion to discredit or undervalue these amended and complete returns can find no support in reason or authority. The certified voting list showing the registration of the names of the voters and that they voted by putting their ballots in the box, is presumptive, and even conclusive, evidence of the total number of votes cast at the election, and should prevail, unless the presumption is rebutted and overcome by evidence to the contrary. *Board of Trustees* v. *Board of County Commissioners,* 61 Kan. 796, 60 Pac. 1057; *People* v. *Ruyle,* 91 Ill. 528; 15 Cyc. 376. Nothing is shown here to discredit or impeach the truth of the amended returns. It therefore appears beyond a reasonable doubt that the amendment did not receive a majority of the votes cast at the election.

I do not know what the legislature thought about this amendment when they passed the resolution inserting it into the Constitution. I can only judge from the language used in the resolution. There were nine constitutional amendments voted upon at the same election, and afterwards inserted into the Constitution by the legislature at the same session of 1916. One of these nine amendments was the initiative and referendum amendment here involved. All of the other eight amendments, except one, received more than twenty thousand and thirty-six votes, a majority of the votes cast, according

to the amended returns, the only returns that even attempted to show, and did show, the actual total vote cast, and the legislature adjudicated and certified the fact, in the resolutions inserting these other eight amendments, in the following language:

"And as appears from the returns thereof, duly made to the secretary of state, a majority of the qualified electors voting thereat voted in favor of the said amendment." Acts of 1916, p. 218.

It is seen that the legislature adjudged and certified the important fact that these eight amendments received a majority of the votes cast as required by section 273 of the Constitution, and they had no trouble in adjudicating this fact because these eight amendments except one had, as a matter of fact, received a majority of the forty thousand and seventy votes cast at the election, and the decree of this fact by the legislature was proper, and should forever preclude inquiry as to matters behind it. But when the legislature resolved to insert the initiative and referendum amendment, here in question, observe what they said in this resolution, which I quote as follows:

"As appears from the returns duly made to said secretary of state, nineteen thousand, one hundred and eighteen votes were cast in favor of said amendment, and eight thousand, seven hundred and eighteen votes were cast against said amendment. Therefore, be it resolved," etc. Acts 1916, page 219.

It seems that the legislature was careful to avoid adjudging and certifying that this initiative and referendum amendment had received a majority of the votes cast at the election, but they inferentially negatived the fact. They did not even attempt to say how many votes were cast, but leave the reader to infer what he will for himself. And we are asked to certify a fact which the legislature refused to do. I cannot consistently do so. Why did they not certify in this resolution, as they had in the other eight resolutions, that the amendment re-

ceived a majority of the votes cast at the election? This court has often held that boards of supervisors in minor matters before them must adjudicate and certify upon their minutes, certain facts in order to give validity to their actions. All will no doubt agree that the legislature either did not believe this amendment had received the constitutional majority at the polls, or they seriously doubted it, and yet they inserted it in the face of section 273, which is mandatory and imperative, and which so clearly prohibits the insertion, unless it shall conclusively appear that the amendment received a clear majority of the votes cast at the election. And the majority decision of this court is now giving judicial sanction, in my judgment, to this violation of the Constitution.

2. I am equally certain that the initiative and referendum amendment to the Constitution is invalid, for the reason that it was not properly submitted to the voters, as required by section 273 of the Constitution, which reads in part as follows:

"And if more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for or against each amendment separately."

I think that the amendment as submitted contains more than one subject, or purpose, and is therefore not one single amendment, which should have been submitted separately.

The majority opinion relies upon the *Jones Case, supra,* for its support, and I accept that decision as being correct, and I propose to follow it as the law in this state in discussing the questions involved in this case. The principle announced in the Jones Case, which I quote from that opinion, is as follows:

"In order to constitute more than one amendment, the proposition submitted must relate to more than one subject, and have at least two distinct and separate purposes, not dependent upon or connected with each other."

This is a sound rule, and it was applied in the Jones Case by extreme liberal construction; but my brethern here make the plain mistake of applying that principle to a problem quite different from that presented in the Jones Case. The trouble is not with the principle announced, but the error lies in its application. The amendment involved in the Jones Case was an amendment of section 153 of the Constitution, which provides that the judges of the circuit and chancery courts shall be elected instead of appointed, as provided by this single section 153 before amended. The amendment there was of one section of the Constitution and dealing with one subject, viz. *nisi prius* courts, or judges of courts of original and concurrent jurisdiction. The Constitution treated it as one subject. Though separated in the administration of their respective functions in this state, either court could hear and determine all matters within their respective original jurisdictions— and this is done in some states—if one or the other court were abolished. The purpose there was to change the Constitution so that this particular part of the judiciary, treated as one subject in one section, would be elective, instead of appointive, thereby prescribing a harmonious scheme of electing these *nisi prius* judges, with similar, original, and concurrent jurisdictional powers.

But the case at bar is radically different. Here the amendment submitted and voted upon as one amendment contains three distinct subjects, or powers, or purposes, to wit: First, the right by petition of six thousand voters to refer any legislative act to the people for approval or rejection; second, the right of seven thousand five hundred voters to propose any measure by initiative petition to the people for adoption or rejection; third, the word "measure" meaning any constitutional amendment or legislative measure, bill, or statutory law, it provides for amendment of the Constitution by initiative petition. In the *Jones Case, supra,* this court said,

in substance, that if the proposition submitted related to more than one subject, and to separate purposes independent of each other, then it was imperative under the Constitution that the matters be submitted separately.

Is there more than one subject, or one purpose, embraced in the proposition submitted in the case before us? That there is more than one subject here must clearly appear to the mind of the well-seasoned lawyer. It deals with section 33 of the Constitution by changing the exclusive method of enacting statutory law by the legislature, subject to the veto power of the Governor; and it deals with section 273 of the Constitution, a different section in a different article from section 33, and changes the exclusive method prescribed there of amending the Constitution, and in effect strikes down the safeguards there provided. Therefore the amendment relates to at least two subjects: The enactment or repeal of statutory law; and the change or amendment of Constitutional law.

That there is a clear difference between a statutory provision and a constitutional provision, I have no doubt whatever. The distinction between the two is a matter of legal and judicial history. From time immemorial they have been treated as separate and distinct in character and dignity by the makers and expounders of the law. Should you say that there is no difference between the two, you then put them upon a parity, and dispute the necessity and wisdom of any Constitution at all. Constitutions are made by the people, and are basic rules, and the supreme law of the land. Statutory law is enacted by the legislature, within the limits and powers prescribed and conferred by the Constitution. But my bretheren say that the two matters or subjects are but one subject in fact; that is, "law," statutory and constitutional. This reasoning is unsound, and finds no supporting authority outside the minds of my learned associates. To illustrate the error they make: If you speak of a humming bird and an eagle, you would,

in a sense, speak of the same subject, viz. "birds," "fowls of the air;" but a clear difference exists between the two kinds of birds. Here there are two subjects of "laws"—not one single subject of "laws," but two subjects of "laws," disconnected with and independent of each other.

The amendment has more than one distinct and separate purpose. Its purpose was to do three separate and distinct things, viz.: To provide a referendum to approve or reject the legislative acts; second, to provide that laws may be proposed and adopted by initiative petition; and, third, to provide that the Constitution may be changed or amended by initiative petition of a different number of voters than is required for other initiative and referendum petitions—thus showing the distinction in the different subject-matters. None of these three subjects are connected with, or dependent upon, the other, but they are separate and distinct from each other, and may stand alone; therefore the amendment here submitted contains at least two, if not three, amendments that should have been submitted separately. The voter might favor one, or even two, of these amendments, and wish to reject the other; but he must take or reject all or none, because he is denied his constitutional right to vote on the amendments separately. Some voters might think the referendum is a good law for the purpose of a check or veto power against undesirable legislation; while others may believe that amending the Constitution by initiative petition of a small per centum of the people, thereby subjecting the Constitution to change by political waves, or the fanciful whims of a few people, is not wise or desirable. Therefore the people should be permitted to vote on the amendments separately.

In the *Powell Case, supra,* the court, through Chief Justice Whitfield, said:

"Whether an amendment is one or many clearly must depend upon the nature of the subject-matter cov-

ered by the amendment. If the propositions are separate, one in no manner dependent upon the other, so that a voter may intelligently vote for one and against the other, one being able to stand alone, disconnected wholly from the others, then such amendments are many, and not one, are severable, and not a unit, are complete each in itself, and not each a part of an interdependent scheme.''

While it is true, in a broad and general sense, constitutional provisions and statutory enactments are ''laws,'' they are treated as different subjects, as distinct subjects, both by the law writers and by the courts. They are both laws, but one is the supreme law, the organic law, superior to legislatures creating them, and limiting and defining their powers. It is true that the people, in promulgating the Constitution, provided for its amendment, which amendment must be by the people; but in the article on the subject we have surrounded the subject with safeguards and difficulties, and this was done advisedly and for a very vital purpose. In the *Jones Case, supra,* the court said:

''The evident purpose of this section [referring to section 273 of the Constitution] is to exact the submission of each amendment to the Constitution on its merits alone, and to secure the free and independent expression of the will of the people as to each. The importance of this cannot be too strongly stated.''

Again, it is said in the Jones Case:

''That the people of the state, acting through the constitutional convention which framed the Constitution, intended to impose and did impose certain limitations upon amendments of that instrument which must be strictly followed before the same can be amended, we entertain no sort of doubt.''

Following the rule laid down in the Jones Case, and applying the principle announced there, it is not difficult to become thoroughly convinced that there is a marked difference between this case and the Jones Case,

and that the case before us now does not come within the rule or principle announced by Justice Sexton in the Jones Case.

3. In speaking of the importance and necessity of the Constitution being difficult to change, and the desirability that it be a permanent instrument, Justice WHITFIELD, in the *Powell Case, supra,* 77 Miss. at Page 578, 27 So. 933, 48 L. R. A. 652, says:

"The significant fact thus stands out, like a mountain in the landscape, that for the whole period of time from 1817 to 1890, the Constitution of the state having been four times changed during such period, a period of seventy-three years of state history, the people of this state, speaking through their sovereign instrument, the Constitution, had uniformly declared that no majority of electors less than a majority of those voting for members of the legislature (which election would bring out, it was presumed, the largest number of electors), should avail to change the organic law of the land. That law reaches with its protection every one in the state. Unlike an act of the legislature, which may or may not be general, its effectiveness is universal, its potency reaches in its power the territorial limits of the whole state and protects all rights of life, liberty and property thereunder. This charter of our liberties, this ark of the covenant, the people for seventy-three years had said should not be touched lightly or carelessly changed."

The views of Justice SMITH, in *Dantzler Lumber Co.* v. *State,* 97 Miss. 355, 53 So. 1, are valuable on this subject. Here is what he said: "It is true that Constitutions may be amended; but it is also true that this can be done only with great difficulty, and, moreover, frequent changes in the fundamental law of a state are not desirable. But, be that as it may, Constitutions must be construed upon the theory that they were intended to last for all time. The supreme court of the United State long since has said, in *Martin* v. *Hunter,* 1 Wheat. 304, 4 L. Ed. 97, that the Constitution was not intended to provide

merely for the exigencies of a few years, but was to endure through a long lapse of ages.''

The majority opinion of this court, upholding the initiative and referendum amendment to the Constitution, practically abolishes representative state government, and places constitutional amendments on a parity with ordinary statutes in Mississippi. In effect, the strength and dignity of the Constitution as a system of basic law, and its permanency as a charter of liberty and equality, protecting the weak against the strong, the minority against the majority, and preserving a government by the white man, is seriously impaired. Such was not the public policy of our state, nor the expectation of the wise constitution makers when they framed it. These public benefactors would hardly believe that the Constitution they wrote, and which has withstood all assaults, and has been followed by the Southern States as a model of ingenuity and wisdom, would so soon be changed by amendment, so as to destroy its purpose and policy. But, of course, changing or altering the Constitution is permissible under its own provisions, and if it be the wish of the people that it be changed, then no man should complain; for, after all, the people are the government, and should have the supreme right and power to control it, either directly of indirectly, as they may prefer, and this inherent right cannot be taken away nor surrendered, except by the people themselves. But when the people speak through their Constituton, and provide a plain, positive, and exclusive method of changing or amending it, that method should be followed as prescribed, for it is unquestionably true that the command of the Constitution is but the voice of the people speaking through their organic charter.

In the case before us the method prescribed by the people, through their Constitution, for amendment thereof, was not followed, but the positive directions of the Constitution on that subject, in my judgment, were ignored and flagrantly violated; and as a result of this

erroneous decision, the Constitution, the rock of the fathers, may now be easily changed, or repealed, by the method provided in the crude and defective initiative and referendum amendment here in question. That sacred instrument, which has so long been regarded as a monument to the wisdom and patriotism of the great minds that framed it, some of whom have passed to the Great Beyond, is now stripped of its dignity and stability and put upon equal terms with the ordinary legislative act, and that, too, without giving the people a chance to vote on it separately, and without adopting it by a majority vote, as required by the people in speaking through their Constitution.